KILLEEN v. BUFFALO FURNACE CO. et al.

(Circuit Court, W. D. New York.   August 15, 1905.)

1. PATENTS—INFRINGEMENT—CASTING APPARATUS.

The Killeen patent, No. 608,143, for casting apparatus for blast furnaces, consisting of a metal skimmer trough having a skimming barrier and a dam below, and as an essential feature a drain opening in the side of the trough above the dam, was not anticipated, and, while of narrow scope, in view of the undoubted utility and the immediate and wide adoption of the apparatus by those skilled in the art, must be conceded novelty and patentable invention.   Also *held* infringed by the device of the Bachman patent, No. 636,885.

2. SAME—PRIORITY OF INVENTION.

The general rule is that he who first reduces an invention to practice is ordinarily held to be the inventor as against another who claims to have previously conceived the idea which led to the invention, but made no practical application of it.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 116, 117.]

In Equity.   On final hearing.

John R. Bennett and James K. Bakewell, for complainant.
Roberts, Becker, Messer & Groat (Tracy C. Becker, of counsel), for defendants.

HAZEL, District Judge.   This action is brought for infringement of letters patent No. 608,143, issued to the complainant, Michael Killeen, on July 26, 1898, for improvement in blast-furnace casting apparatus.   The inventor states in his specification:

"My invention relates to the casting of metal from a blast-furnace into pigs or ladles, and is designed to largely do away with the expense, difficulties, and dangers connected with this operation.   Heretofore in this casting operation metal flowed from the furnace into a short metal trough, at the end of which was located a trough of sand provided with a skimmer and dam to raise the level of the metal above the lower end of the skimmer, the runners extending from this skimmer-trough being made of sand molded into form by the workmen."

The claims, all of which are involved, read as follows:

"(1) A blast-furnace skimmer-trough having a skimming-barrier, and a dam below the barrier and projecting upwardly above that portion of the trough-bottom which is beneath the barrier, said trough having above the dam, a draining-opening for the metal backed up by the dam.

"(2) A metal skimming-trough having a skimming-barrier, and a dam below the barrier, said trough having a draining-opening in its side at a point between the dam and the barrier.

"(3) The combination with a blast-furnace, of a metal skimmer-trough leading therefrom, said trough being provided with a skimming-barrier, said barrier with a dam below the same and extending up above the general level of the trough-bottom, and arranged to back up the metal in the skimmer-trough and said trough having a draining-opening for the metal at a point above the dam."

Claims 1 and 3 broadly cover the combination of an iron skimmer-trough, skimming-barrier, dam below the barrier, and the drain opening above the dam.   Claim 2 is specifically for the drain opening in the side of the trough.   The defendants deny infringe-

ment, and aver anticipation and prior use. The invention is simple, and apparently was granted by the Patent Office to protect the feature which describes a drain opening above the dam in the side of the trough, as the mere substitution of a runway constructed of metal for one of sand was thought not to involve patentability. The proofs show that in the process of reducing iron ore to a metallic state a large quantity of molten slag or cinder is produced, which floats on top of the iron, and formerly was drawn off at the side of the furnace through a slag notch located at a higher level than the tap hole of the furnace. This arrangement was not satisfactory, owing to the imperfect separation of the slag and iron. Later the arrangement for drawing off iron and slag was altered. Prior to the invention in suit, which was applied for on October 18, 1897, as the cast of iron flowed from the furnace it passed through a runner specially constructed of sand by the workmen. The slag floating on top of the iron was removed by means of an iron gate or skimming-barrier driven in the sides of the sand runway, and arranged to hold back the slag while the metal flowed unimpeded underneath the skimming-barrier. A dam was constructed in the runway just below the skimming-barrier to keep the molten mass of iron at sufficient height and enable the skimming-barrier to functionally operate. It was customary to depress or remove a portion of the top of one side of the runway about 20 inches just above the barrier device toward the furnace to enable the slag from the pool of molten iron formed by the dam to flow through such depression to the slag-bed or slag-ladle, so called. When the cast was completed—that is, when the blast was taken off the furnace—the temporary dam was removed, in order to draw off the pool of iron backed up by the dam, and the molten iron flowed onward to the pig-bed, while the slag remaining in the runner was drawn off by tearing away the side of the runway and its flow diverted in another direction. This method for removing the slag and draining the metal to the molds was wholly objectionable owing to the frequent formation of what is technically known as "boils," caused by moisture in the sand or clay. The ebullition in the molten mass, according to the expert witnesses for both parties, seriously interfered with the progress of the work, was exceedingly harmful to the product, and endangered the workmen. The invention in suit is claimed to have entirely eliminated the formation of boils and other imperfections in the casting apparatus, and to have largely decreased the expense and labor in blast furnaces. The specification states:

"In order to overcome these difficulties, I provide a permanent metal skimming-trough, having a skimming-barrier and a dam below the barrier and projecting above the trough-bottom, the trough having a drain-opening above the dam to tap off the metal backed up by this dam. I also preferably use a metal-trough system leading to the ladles or molds, though this is not essential."

The evidence justifies the claim that boils in the molten mass have been eradicated, and the expense of labor appreciably reduced.

In these circumstances, assuming the patent not anticipated, its utility cannot be successfully controverted. In patents of this character, where the field of invention is necessarily circumscribed, slight differences are important, and have often brought complete success where absolute failure prevailed. Highly beneficial results have frequently been attained by a few minor alterations which are not only substantial betterments in the prior art, but achieve absolute practicability and overcome a state of comparative inoperativeness. Such, apparently, was the situation here, although the Patent Office granted the patent with evident reluctance. Despite persistant urging of the allowance of the original claims, the application of Killeen was repeatedly rejected on the ground that such claims lacked novelty in view of the prior art. An appeal to the examiners in chief resulted in narrowing the claims to a draining-opening in a metal trough, although the examiners expressed doubt as to the validity of the patent, and as to whether the draining-opening mentioned in the claims was not within the knowledge of the skilled in the art. These doubts, however, do not seem to have been fully justified in view of the evidence showing the failure of the prior art to eradicate the evils of boils in the molten iron and the omission of the skilled workman to perceive the absolute necessity of supplying the means of draining, which probably would have made the prior art successful. The achievement of Killeen perhaps cannot be regarded as disclosing great ingenuity, yet he undoubtedly reduced to practice a conception which materially advanced the art. Beyond dispute his invention resulted in substantial benefit to those engaged in conducting industries of the character to which the device specially pertains. That a metal skimmer-trough, having a skimming-barrier and dam below the barrier, combined with a drain opening above the dam, would create a practical casting apparatus, and overcome the long existing difficulties and imperfections in the sand runner system, evidently did not occur to the skilled workman, or any one engaged in the business of metal casting. As was said in Hobbs v. Beach, 180 U. S., at page 392, 21 Sup. Ct., at page 413, 45 L. Ed. 586:

"This very fact is evidence that the man who discovered the possibility of their adaptation to this new use was gifted with the prescience of an inventor. While none of the elements of the Beach patent—taken separately, or perhaps even in a somewhat similar combination—was new, their adaptation to this new use, and the minor changes required for that purpose, resulted in the establishment of practically a new industry, and was a decided step in advance of any that had theretofore been made."

Moreover, in considering the question of novelty, the evidence that the Killeen device went into immediate and extensive use in furnace plants throughout the United States has material weight. The general approval by the skilled in the art, according to the settled rule, even though the novelty of the invention is in doubt, presents cogent and persuasive reasons for holding that the claims in question involved patentable merit. Magowan v. Belting Co., 141 U. S. 332, 12 Sup. Ct. 71, 35 L. Ed. 781; Raymond v. Keystone

Lantern Co. (C. C.) 132 Fed. 34; Kinloch Tel. Co. v. Western Electric Co., 113 Fed. 659, 51 C. C. A. 362; Hobbs v. Beach, supra.

The Killeen patent was not anticipated. The patent to Hartman dated June 27, 1893, No. 500,386, upon which reliance is placed by defendant, has never been put into practical use. According to the expert witnesses for complainant, the Hartman apparatus is wholly impracticable, and its inefficiency is explained by reason of the inventor's omission to provide means for draining the pool in front of the dam. This is the important element in complainant's patent, the iron trough and skimming-barrier being familiar to the art. The inventor, Hartman, witness for defendant, has not affirmed the practical operativeness of his device, and he admits that it has never been used. He explains that his application was divided by the Patent Office, and that the feature relating to the skimming-barrier was omitted. This explanation is too indefinite for consideration upon the question of anticipation. The method of draining the pool cannot be read into his claims, nor construed to be included therein, by implication. His device never having been used, the necessity of such an opening was not obvious to those skilled in that class of workmanship.

As to prior use, the defendants contend that one Vaughan, witness for defendants, used a device of sand, which, concededly, was similar to that of complainant, except that the latter was built of iron. The proofs show that the patentee, Killeen, visited the furnace where Vaughan was employed while the sand runner was in operation, and was then informed by Vaughan that it was his intention to construct an iron skimmer-trough. Later Vaughan visited the blast furnace where Killeen was employed, and observed in use there a sand runner, dam, and skimming-barrier similar to that used by him. At a subsequent visit Vaughan was informed by the patentee that he had obtained a patent on a metal casting device. The record contains other evidence showing that Vaughan in fact made disclosure of his intention to make a trough of iron to prevent the formation of boils and instructed an employé to make the necessary patterns. Such patterns were completed about January 5, 1898, their construction having been commenced in November, 1897, and the device was actually cast on July 1, 1898. The evidence falls short of showing that such apparatus was used by Vaughan prior to the application in suit. Upon this point the settled rule requires that the defense of prior use be established by convincing evidence and beyond reasonable doubt. The Barbed Wire Patent, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154. Assuming that Vaughan was the first to conceive the construction in suit, he certainly cannot be classed as the first inventor simply because in his mind he was satisfied that a reproduction in metal of his sand apparatus would obviate the difficulties of the cast. Had his conception at the time of its disclosure to others been sufficiently developed and perfected to indicate to the skilled in the art that something tangible had actually come into existence, a different question would be presented. The general rule is that he who first reduces an invention to prac-

tice is ordinarily held to be the inventor, as against another who claims to have previously conceived the idea which led to the invention. The language of Judge Lurton, speaking for the Circuit Court of Appeals, Sixth Circuit, in Standard Cartridge Co. v. Peters Cartridge Co., 77 Fed. 630, 23 C. C. A. 367, is apt, and may be quoted:

"The mere existence of an intellectual notion that a certain thing could be done, and, if done, might be of practical utility, does not furnish a basis for a patent, or estop others from developing practically the same idea."

The crucial question is that of infringement. Defendants" alleged infringing device at the Buffalo Furnace Company's plant is shown in a patent to Frank E. Bachman, No. 636,885, granted November 14, 1892. The defendants contend, inter alia, that the claims of the patent should not be so construed as to cover the Bachman apparatus, inasmuch as the draining opening of the latter is not the equivalent of that in complainant's device. Upon this point the elicited facts show that defendants' construction differs from the specific construction of complainant's apparatus, which, as already noted, has a single drain opening in the side of the trough located between the adjustable skimmer and the dam, while the defendants use two drain openings. The specification of the Bachman patent discloses a casting apparatus having three sections of a trough joined together; that is, a short iron trough, a short sand runner, and a second iron trough. The iron troughs are separated by a central plate, upon which is constructed the path or runner of sand, the sides of which are supported by iron plates. The skimmer device is in the first trough near the central plate, while in the lower trough, near the runway, is a movable dam, and in the rear of the dam a supplementary trough. The specification describes a drain-opening under the dam to drain the iron lodged between the dam and the furnace, and a drain or opening in the sand runway through which the surplus slag is drained to the slag-bed after the iron has been drained to the pig-ladle. There may be force in the suggestion that the Bachman device improved the invention in suit by the removable dam and supplementary trough features mentioned. Such fact, however, if it is a fact, does not carry with it the right to appropriate the essential elements of complainant's invention. The defendants' apparatus is substantially like that of complainant, except as hereinbefore pointed out. They use a cast-iron trough, provided with a dam and skimming-barrier, the draining-opening above the dam and below the skimming-barrier, and hence fairly come within the language of the involved claims. Du Bois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895. By the use of the draining-openings at a point above the dam to drain the pool of molten iron in combination with the metal trough, skimming-barrier, and dam below the barrier, the defendants have wrongfully adopted the complainant's patent. If there is novelty in the claims of Bachman, it is subsidiary to the invention of Killeen.

It follows that complainant is entitled to a decree for an injunction and accounting, with costs.