**ATCHISON, T. & S. F. RY. CO. v. LA PRADE, Atty. Gen.**

**SOUTHERN PAC. CO. v. SAME.**

Nos. 195, 196.

District Court, D. Arizona.

March 8, 1933.

L. H. Chalmers, H. M. Fennemore, and Thomas G. Nairn, all of Phœnix, Ariz., and Robert Brennan, of Los Angeles, Cal. (E. E. McInnis and H. W. Davis, both of Chicago, Ill., of counsel), for plaintiff Atchison, T. & S. F. Ry. Co.

Alex B. Baker and Louis B. Whitney, both of Phœnix, Ariz. (Guy V. Shoup and Henly C. Booth, both of San Francisco, Cal., of counsel), for plaintiff Southern Pac. Co.

K. Berry Peterson, Atty. Gen. of Arizona, Charles L. Strouss, Asst. Atty. Gen. of Arizona, and Donald R. Richberg, Sp. Asst. Atty. Gen. of Illinois, for defendant.

Before JACOBS and ST. SURE, District Judges, and WILBUR, Circuit Judge

JACOBS, District Judge.

These suits were instituted in the Phœnix division of the District Court of the United States, district of Arizona. They seek to enjoin the Attorney General of the state from enforcing what is styled as the Arizona Train Limit Law, passed and approved May 16, 1912, which prohibits any railroad in Arizona from operating passenger trains consisting of more than fourteen cars, and freight trains of more than seventy cars, exclusive of caboose, over its road or any portion thereof, and fixes a penalty of not less than $100 or more than $1,000 fine for each offense. The statute also provides: "And such penalty shall be recovered, and suits therefor brought by the attorney general, or under his direction, in the name of the state of Arizona, in any county through which such railway may be run or operated. ` ` * " The Rev. Code of Ariz. 1928, § 647.

The suits were consolidated, as they each involve the same issues and seek the same relief, and, being suits that fall within the provisions of section 266 of the Judicial Code (28 USCA § 380), the trial judge called to his assistance Hon. Curtis D. Wilbur, United States Circuit Judge, and Hon. A. F. St. Sure, United States District Judge of the Ninth circuit, at San Francisco, Cal.

The defendant answered and filed motions to dismiss based on jurisdictional grounds, which were denied by the court on October 1, 1929. See Southern Pac. Co. v. Peterson (D. C.) 43 F.(2d) 198. Thereupon, a master was appointed to take the evidence, certify and report the same, together with his findings of fact and conclusions of law, which report was filed on the 29th day of July, 1932.

Thereafter, and in due time, the defendant filed exceptions to the master's findings and conclusions, and also a motion to suppress the report, and stipulated that the evidence certified by the master and included in his report might be considered by the court in deciding the issues involved.

The cases were set down for final hearing on February 8, 1933, at San Francisco, Cal., by stipulation of all parties.

The term of office of the defendant K. Berry Peterson having terminated on January 3, 1933, and Mr. Arthur T. La Prade having been elected Attorney General of the state of Arizona, and qualified as such, the plaintiffs, in due time and after notice, as provided in subdivision (c) of section 780, title 28, USCA, moved the court to substitute Mr. La Prade in the place and stead of the defendant Peterson; the motion being noticed on the date of the final hearing.

The defendant La Prade made special appearance for the purpose of objecting to the substitution, and urged, as grounds of his objection, that the suits being against the defendant Peterson individually, when his term of office expired, the questions involved as to him became moot; that, there being no pleadings charging him with having threatened to enforce the Arizona Train Limit Law, there was no cause of action stated against him; that he could not be mulcted in costs incurred against the defendant Peterson; that the suits instituted against the defendant Peterson should be dismissed and plaintiffs compelled to institute new proceedings against the defendant La Prade.

We will first deal with this all-important question of the substitution of the defendant La Prade. Section 780, title 28 USCA, provides:

"(a) Where, during the pendency of an action, suit, or other proceeding brought by or against an officer of the United States, or of the District of Columbia, or the Canal Zone, or of a Territory or an insular possession of the United States, or of a county, city, or other governmental agency of such Territory or insular possession, and relating to the present or future discharge of his official duties, such officer dies, resigns, or otherwise ceases to hold such office, it shall be competent for the court wherein the action, suit, or proceeding is pending, whether the court be one of first instance or an appellate tribunal, to permit the cause to be continued and maintained by or against the successor in office of such officer, if within six months after his death or separation from the office it be satisfactorily shown to the court that there is a substantial need for so continuing and maintaining the cause and obtaining an adjudication of the questions involved.

"(b) Similar proceedings may be had and taken where an action, suit, or proceeding brought by or against an officer of a State, or of a county, city, or other governmental agency of a State, is pending in a

court of the United States at the time of the officer's death or separation from the office.

"(c) Before a substitution under this section is made, the party or officer to be affected, unless expressly consenting thereto, must be given reasonable notice of the application therefor and accorded an opportunity to present any objection which he may have."

From the historical note to this section it appears that the act is derived from that of February 13, 1925, which was substituted for the earlier act of 1899. The act of 1899 resulted from a suggestion of the Supreme Court contained in the opinion in the case of U. S. ex rel. Bernardin v. Butterworth, 169 U. S. 600, 18 S. Ct. 441, 42 L. Ed. 873, and related to federal officers. The action of Congress in passing section 780 as it now stands, no doubt resulted from the suggestion of the Supreme Court contained in its opinion in the case of Irwin v. Wright, 258 U. S. pages 223, 224, 42 S. Ct. 293, 295, 66 L. Ed. 573, in which the court said: "It may not be improper to say that it would promote justice if Congress were to enlarge the scope of the Act of February 8, 1899, so as to permit the substitution of successors for state officers suing or sued in the federal courts, who cease to be officers by retirement or death, upon a sufficient showing in proper cases. Under the present state of the law, an important litigation may be begun and carried through to this court after much effort and expense, only to end in dismissal because, in the necessary time consumed in reaching here, state officials, parties to the action, have retired from office. It is a defect which only legislation can cure."

In the case of Calendonian Coal Company v. Baker, 196 U. S. at page 441, 25 S. Ct. 375, 377, 49 L. Ed. 540, which was a mandamus proceeding, the court, in commenting on the question of substitution in cases of this character, said: "And, if a successor in office may be substituted, he may be mulcted in costs for the fault of his predecessor, without any delinquency of his own. Besides, were a demand made upon him, he might discharge the duty and render the interposition of the court unnecessary."

██ There is a broad distinction between the instant cases and the rule last above announced. The Attorney General of Arizona holds office until his successor is duly elected and qualified. Article 5, § 1, Arizona Constitution; section 56, Rev. Code Ariz. 1928. The Arizona statute involved herein imposes the duty on the Attorney General of the state, and him alone, to enforce the Train Limit Law. It is a continuing statutory duty devolving upon each succeeding Attorney General of the state. This duty is imposed upon Mr. La Prade as it was upon Mr. Peterson, and will continue to be inherited by each succeeding Attorney General as long as the act remains upon the statute books of Arizona. The plaintiff's cause of action, in so far as the same may depend upon the threatened injury, does not rest upon any expression of intent on the part of the defendant other than his oath of office, as the threat is contained in the language of the statute. When the defendant La Prade took the oath of office, it became his sworn duty to enforce the law. As long as there is an Attorney General in the state, the threat of prosecution is always present, and the injury, if any, resulting therefrom is always impending. Commonwealth of Pennsylvania v. State of West Virginia (State of Ohio v. State of West Virginia), 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300.

██ These suits have been pending since 1929. Much time and a large sum of money have been expended in preparing them for final adjudication. Twenty-five volumes of evidence, comprising about 10,000 pages, were included in the master's report to this court. The questions involved are of grave importance, not alone to the plaintiffs, but to the public at large. We therefore find that there is a substantial need for continuing and maintaining these causes and obtaining an adjudication of the questions involved, that it is a proper case in which substitution should be made, and, as costs in equity cases are in the sound discretion of the court (DuBois v. Kirk, 158 U. S. 58–67, 15 S. Ct. 729, 39 L. Ed. 895) the motion to substitute the defendant La Prade in the place and stead of Peterson is granted, upon condition that no costs that have accrued prior to or after the substitution, may be assessed against him. The motion of defendant La Prade to dismiss, as to him, is denied. The defendant Peterson moved the court to dismiss the bills of complaint as to him, which motion is also denied.

At this juncture the defendant and his counsel announced that they would not participate further in the proceedings, retired from the courtroom, and apparently abandoned the case.

The court, having announced its intention to prepare findings of fact and conclusions of law reflecting its independent judg-

ment based upon the entire record, the defendant's exceptions to the master's findings of fact and conclusions of law are overruled without costs, and the motion to suppress the master's report denied. This brings us to a consideration of the merits of the case.

The plaintiffs contend and allege that the Train Limit Law of Arizona is unconstitutional and void for the following reasons: That it invades the exclusive legislative field of Congress as limited by the Commerce Clause (paragraph 3 of section 8 of article 1 of the Constitution of the United States); it is in conflict with the train supply or train service clauses of the Car Service Provision (paragraphs 10 to 17, inclusive, and paragraph 21 of section 1) of the Interstate Commerce Act, 49 USCA § 1 (10–17, 21); it is in conflict with and amounts to an unlawful attempt to supplement the Boiler Inspection Act, as amended (45 USCA § 22 et seq.), the power brake provisions of the Safety Appliance Acts (45 USCA § 1 et seq.), and section 26 of the Interstate Commerce Act (49 USCA § 26), which operate upon the subject and are directed to the same object as the said Train Limit Law, and that Congress has completely and exclusively occupied the field of legislation covering train lengths; that it is an undue and unreasonable regulation, burden upon and direct interference with interstate commerce, and deprives plaintiffs of the usefulness of their facilities, in violation of said Commerce Clause; it deprives plaintiffs of their property without due process of law, in violation of section 1 of the Fourteenth Amendment of the Constitution of the United States; that the observance of the law necessitates expenditures between both companies of additional overhead costs of operation amounting to about $1,000,000 annually; that the police power of the state has been superseded, as Congress, under power conferred by the Constitution, has occupied the field of legislation involved herein.

The answers deny these allegations and allege that the Arizona statute bears a real and substantial relation to the safety of train operation; that it is not a subject of regulation exclusively vested in Congress, but that it is a reasonable regulation designed to promote the safety of employees and the public generally; that Congress has not occupied this field of legislation and that until it does, the act is valid and wholly within the police power of the state.

It appears that Arizona is the only state in the Union in which a law limiting the number of cars to be operated in freight or passenger trains has ever been enacted.

We will deal with the Arizona statute in so far as it affects interstate commerce, as we are not concerned with its operation locally within the state otherwise than as local shipments may be involved in interstate transportation.

 Clearly, the Constitution has conferred upon Congress full and exclusive power to regulate commerce between the states, and any attempted enforcement of the statute of a state, passed under the guise of the police power which directly affects interstate commerce to such an extent as to amount to a regulation thereof, is void and will be enjoined. Hall v. DeCuir, 95 U. S. 485, 489, 24 L. Ed. 547, and other cases.

 If it should be determined that the various states have power to regulate interstate train lengths, then each state might prescribe a different limitation. A transcontinental shipment originating in California and destined for the Atlantic Seaboard would require the carrier to break up and rearrange its trains before it could enter the boundaries of each state to comply with these varying limitations. This would involve an unreasonable delay in the handling of interstate traffic and impose an unreasonable burden on the same. The evidence shows that attempts have been made in the states of Indiana, Illinois, Wisconsin, California, Colorado, and others to pass statutes, the effect of which are to limit the number of cars in trains. Indiana proposed a 70-car limit; Illinois a half mile limit; Wisconsin a 3,300 foot limit; California various limits based on grades of a half mile or more, and different limits on different grades; Colorado a 65-car limit on certain grades, and, on grades of not less than 1 per cent., a 55-car limit.

The present practice of the plaintiffs in their observance of the Arizona law is illustrative of the extent of interference and the burden that would be imposed upon commerce if different regulations should be prescribed in different states. At the present time east-bound freight trains leave points in California consisting of from 80 to 100 cars or more. These trains are hauled to division points west of the boundary of Arizona. They are there broken up into shorter trains of 70 cars or less to comply with the Arizona law. Additional train and engine crews are provided, the short trains are then hauled through the state to a division point east of the state boundary, where they

are again coupled up into long trains which continue on their transcontinental journeys. The same practice prevails as to west-bound transcontinental traffic.

As said in Hall v. DeCuir, supra: "It was to meet just such a case that the commercial clause in the Constitution was adopted. * * * If each State was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship. Each State could provide for its own passengers and regulate the transportation of its own freight, regardless of the interests of others. Nay more, it could prescribe rules by which the carrier must be governed within the State in respect to passengers and property brought from without. On one side of the river or its tributaries he might be required to observe one set of rules, and on the other another. Commerce cannot flourish in the midst of such embarrassments. * * * Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it Congress, which is untrammelled by State lines, has been invested with the exclusive legislative power of determining what such regulations shall be."

In the case of South Covington Ry. Company v. Covington, 235 U. S. 537–548, 35 S. Ct. 158, 161, 59 L. Ed. 350, L. R. A. 1915F, 792, the opinion of Mr. Justice Day, after quoting with approval from Hall v. DeCuir, supra, said: "We need not stop to consider whether Congress has undertaken to regulate such interstate transportation as this, for it is clearly within its power to do so, and absence of Federal regulation does not give the power to the state to make rules which so necessarily control the conduct of interstate commerce. * * * *"

There are many other cases to the same effect.

We are convinced that the subject of the length of trains engaged in interstate traffic is national in its character, requiring uniformity of regulation, and that the power to so regulate is exclusively conferred upon Congress by the Commerce Clause of the Constitution.

The defense of these suits is based on the contention that Congress has passed no act dealing with the subject of train lengths; that the Boiler Inspection Act, the power brake provision of the Safety Appliance Act, and section 26 of the Interstate Commerce Act, do not cover certain dangers and hazards of train operations, and, until Congress deals specifically with those subjects, the states are free to adopt such reasonable regulations in the exercise of the police power.

■ We cannot agree to this proposition. The Interstate Commerce Act, section 1, subdivision 10, title 49 USCA, which deals with the subject of car service, provides as follows: "The term 'car service' in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter."

Subdivision 14 of said section 1, provides: "The commission may, after hearing, on a complaint or upon its own initiative without complaint, establish reasonable rules, regulations, and practices with respect to car service by carriers by railroad subject to this chapter, including the compensation to be paid for the use of any locomotive, car, or other vehicle not owned by the carrier using it, and the penalties or other sanctions for nonobservance of such rules, regulations or practices."

The power conferred by Congress upon the Interstate Commerce Commission to regulate the supply of trains must necessarily include authority to prescribe the number of interstate trains to be operated by the carrier. The Arizona law limiting the number of cars contained in a freight or passenger train in effect prescribes the number of trains to be operated by the interstate carrier, by increasing the number of trains after interstate commerce enters within the state. It is therefore in conflict with and attempts to occupy the same field of regulation delegated to the Interstate Commerce Commission by the car service act.

Defendant contends that the Arizona statute was passed in the interest of safety to railroad employees, passengers, and the public generally. We find no preamble to the act, and there is nothing in the language of the act to indicate such intention.

■ The dangers and hazards stressed in the defendant's testimony, so far as the general public is concerned, are those of grade crossing accidents, and those that apply to railroad employees and passengers are the shocks resulting from slack action in starting and stopping trains.

Sections 22 to 34, inclusive, title 45 US CA, are what is known as the Boiler Inspection Act. This act requires that every locomotive, its boiler, tender, and all parts and appurtenances thereof must be inspected, as provided in the act. Section 1 of the same title makes it unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine not equipped with power driving wheel brakes and appliances for operating the train brake system. Section 2 provides that it shall be unlawful for a common carrier by railroad to haul or permit to be hauled or used on its line any car not equipped with automatic couplers which can be uncoupled without the necessity of men going between the ends of cars. Section 4 requires each car to be equipped with secure grabirons or handholds in the ends and sides of each car for greater security to men in coupling and uncoupling cars. Section 5 prohibits the use of freight cars which do not comply with the prescribed standard as to height of drawbars. Section 11 makes it unlawful for a common carrier to permit to be hauled or used on its line any car not equipped with secure sill steps and efficient hand brakes, ladders, and running boards. Section 12 provides that all these appliances shall remain as standard equipment to be used on all cars, unless changed by order of the Interstate Commerce Commission. Section 17 makes it unlawful for the carrier to operate a locomotive not equipped with an ash pan which can be dumped without the necessity of any employee going under the locomotive. Section 26 of title 49 USCA, provides that the Commission may order a carrier by railroad to install automatic train stop or train control devices, or other safety devices, which comply with specifications and requirements prescribed by the Commission, upon the whole or any part of its railroad. All of these acts deal with the subject of safety in the operation of railroad trains in interstate commerce.

It would seem from this that Congress has dealt quite extensively with the subject of safety of interstate train operation. The fact that it has not dealt specifically with each element or factor is immaterial, as the Commission, under power conferred by Congress, is fully authorized to prescribe rules and regulations affecting the subject of train operation.

In the case of Napier v. Atlantic Coast Line R. Co., 272 U. S. 605, 47 S. Ct. 207, 210, 71 L. Ed. 432, a case involving a statute of Wisconsin, prescribing a cab curtain for locomotives, Mr. Justice Brandeis said:

"The federal and the state statutes are directed to the same subject—the equipment of locomotives. They operate upon the same object. It is suggested that the power delegated to the Commission has been exerted only in respect to minor changes or additions. But this, if true, is not of legal significance. It is also urged that, even if the Commission has power to prescribe an automatic firebox door and a cab curtain, it has not done so, and that it has made no other requirement inconsistent with the state legislation. This, also, if true, is without legal significance. The fact that the Commission has not seen fit to exercise its authority to the full extent conferred, has no bearing upon the construction of the act delegating the power. We hold that state legislation is precluded, because the Boiler Inspection Act, as we construe it, was intended to occupy the field. The broad scope of the authority conferred upon the Commission leads to that conclusion. * * *

"If the protection now afforded by the Commission's rules is deemed inadequate, application for relief must be made to it. The Commission's power is ample."

From the foregoing, we conclude that Congress has occupied the field of legislation involved, and has granted to the Interstate Commerce Commission full power and authority to deal with the subject, and that legislation by the states is thereby superseded.

▮▮▮▮ From the language of the Arizona statute the limitation of train lengths is made to apply to all trains under all circumstances, and without exceptions. It treats each freight car and each passenger car as a unit, unrelated to any condition under which it is operated, irrespective of its construction, type, length, and weight, or whether it is empty or loaded, and, if loaded, to what extent. It is therefore arbitrary and unreasonable. Seaboard Air Line R. Co. v. Blackwell, 244 U. S. 315, 37 S. Ct. 640, 61 L. Ed. 1160, L. R. A. 1917F, 1184.

The defendant's contention that the Arizona statute is a necessary safety measure for the protection of railroad employees is not sustained by the evidence. The statistical records of the Santa Fé Company, Exhibit 30, show that for the 7-year period of 1922–1929 the train miles per casualty to freight train employees were, on the New Mexico long and short trains, as follows: Long train miles per casualty, 130,000; short train miles per casualty, 115,000.

This exhibit also shows that as to freight train employees during that 7-year period, car miles per casualty were as follows: Car miles per casualty on short trains, 5,796,703; car miles per casualty on long trains, 10,-967,245.

From these statistics, it appears that if the traffic handled in the New Mexico short trains during that 7-year period had been handled by the long trains, almost half of the short train casualties would have been eliminated.

The record clearly shows that long trains operating on main lines is standard practice throughout the United States outside of the state of Arizona. Southern Pacific's Exhibit No. 27 shows that in 33 states, on main line districts of 15 first-class railroads, the freight trains consist of from 86, on the Southern Railway in the district of Colorado, to 179 cars on the Baltimore & Ohio Railway in Indiana.

The defendant's contention that this statute is necessary for the protection of the public at grade crossings is equally untenable, for as a matter of common knowledge the danger of accident increases as the number of trains increase. We are convinced from the evidence that the law bears no reasonable relation to safety of persons or property.

The financial burden imposed upon the plaintiffs by the Arizona law is another important question. The Santa Fé's bill of complaint alleges that from a cost study, which the plaintiff "believes and alleges" to be correct, their freight train expenses on the main line between Barstow, Cal., and Belen, N. M., would be reduced over $600,000 annually, together with various additional savings not taken into account in the cost study. The bill of complaint of the Southern Pacific Company alleges that its cost study shows that by long train operation on its main line between Indio, Cal., and El Paso, Tex., via Maricopa and Lordsburg, their freight train expenses could be reduced over $400,000 annually. The witness A. L. Conrad, assistant general auditor for the Santa Fé, conducted its study, and Vaile S. Andrus, assistant to the vice president, conducted the Southern Pacific study, and the evidence shows that each of these auditors has had vast experience in that line of work. They prepared work sheets containing 33 items necessary to be considered in making a careful estimate, including tonnage, number of cars in the va-rious trains, time of departure and arrival, and mileage traveled by all locomotives in connection with the movement of traffic. Timekeepers inserted the wage information called for by the work sheets, including wages of engine men on train engines, double-header engines, helper engines while double-heading and wages of train men. There is also an estimate of fuel consumption and many other factors. The total estimated savings of the Santa Fé Company were $664,738.33. The showing of estimated savings for the Southern Pacific Company is $417,858.81. These estimates seem to be accurate and reliable, and to fully justify and establish the allegations of the bills on this question.

As before stated, the record in these cases is voluminous. To deal with the testimony in all its details would extend this opinion beyond all necessity. The foregoing is sufficient to demonstrate the effect of this Arizona law on the interstate transportation of freight and passengers over the lines of railroads operated by these plaintiffs. The evidence clearly preponderates in favor of the plaintiffs on all questions involved. We are convinced and find, from an examination of the law and this record, that the Arizona Train Limit Law (section 647 of the Revised Statutes of Arizona 1928), is unconstitutional and void, because, first, it invades the exclusive legislative field of Congress as limited by the Commerce Clause (paragraph 3, § 8, art. 1) of the Constitution of the United States; second, it is in conflict with the train service clause of the car service provisions (paragraphs 10 to 17, inclusive, and paragraph 21 of section 1) of the Interstate Commerce Act; third, it is in conflict with and amounts to an unlawful attempt to supplement the Boiler Inspection Act, as amended, the power brake provisions of the Safety Appliance Acts, and section 26 of the Interstate Commerce Act, which operate upon the subject and are directed to the same object as the said Train Limit Law, and by which Congress completely and exclusively occupied the train length field; fourth, because it substantially and unreasonably impairs the usefulness of plaintiff's facilities; fifth, because it is an undue and unreasonable burden upon and direct interference with interstate commerce, in violation of said Commerce Clause; sixth, because it is so unreasonable as to deprive plaintiffs of their property without due process of law, in violation of the due process clause of section 1 of the Fourteenth Amendment to the Consti-

tution of the United States; seventh, that it is arbitrary and bears no reasonable relation to the safety of persons or property.

That each of the plaintiffs are entitled to a permanent injunction, restraining the defendant Arthur T. La Prade, Attorney General of the state of Arizona, and all persons acting under his direction, and his successors, from enforcing or attempting to enforce, or from advising, instituting, prosecuting, or aiding in any action, suit, or proceeding of any kind or character to recover any penalty or damages for failure or refusal to observe or comply with the provisions of said law. Special findings of fact and conclusions of law, in accordance herewith, to follow.

Decrees will be prepared accordingly.