NEW YORK BELTING & P. CO., Limited, et al. v. SIERER et al.

(Circuit Court, S. D. New York. January 14, 1907.)

**1. PATENTS—INVENTION—SUBSTITUTION OF MATERIALS.**

It is not invention to substitute rubber for an unyielding material in the construction of interlocking tiles for floors, walls, or the decks of ships, to enable the covering to respond to strains more quickly, readily, and safely; such result being due solely to the elasticity and resiliency of the material, which is a well-known quality of rubber.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 23.]

**2. SAME—TILE FLOORS.**

The Furness & Watts patent, No. 527,961, for a tiled floor or wall composed of a series of tiles of yielding material having interlocking tongues and being removable, is void for lack of patentable invention in view of the prior art, which shows interlocking tiles of wood or stone, tiles of rubber not interlocking, and also a covering for floors, the decks of ships, etc., made of rubber in interlocking sections.

In Equity. Suit to restrain alleged infringement of United States letters patent No. 527,961, issued October 23, 1894, to Frank Furness and David H. Watts for "tile floor, wall," etc. The application was filed March 31, 1894. The main defenses are want of patentable invention in view of the prior art; also noninfringement if complainants' patent is valid.

Howson & Howson (Charles Howson and Joseph C. Fraley, of counsel), for complainants.

J. Burnet Nash (Robert H. Parkinson, of counsel), for defendants.

RAY, District Judge. The patent states that the object of the invention "is to prevent tile floors from cracking or opening at the joints because of tension or compression strains." It is not confined to floors, for the patent also says:

"By the use of the above-described tile, a floor can be laid or a wall or ceiling tiled which will yield sufficiently under tension or contraction without the joints between the tiles opening, as all the tiles are locked together."

It thus appears that the art involved is not only the construction of floors, but of walls and ceilings. This is important when we come to consider the prior art. The patent also says:

"My invention relates particularly to the tiling of floors and decks of vessels, and especially the floors of ocean steamships; but it will be understood that my tiling can be used in other places without departing from my invention."

In the drawings is shown what the patent says is the preferred form of tiles, "in which one tile interlocks directly with another," and also another form, where the tiles interlock "indirectly through the medium of key tiles." All are interlocking tiles in some form or other, and all are of "yielding material." The patent is broad enough to cover all tiled floors or walls composed of yielding material having interlocking tongues, and so interlocked as to be removable. The patent also says:

"Referring particularly to Figs. 1 and 3, A is the tile made of yielding material, preferably rubber, of such a density that it will hold its own under

ordinary circumstances, but will yield sufficiently when great strain is placed upon it, or will yield under pressure. The tile is quadrangular in shape in the present instance, and at each side are cavities, a, with receding sides forming at each corner undercut arrow-head projections, b. Interlocking with these tiles, A, as shown in Fig. 1, are tiles, D, having undercut projections, d, at each side, which lock into the cavities, a, of the tiles, A, so that when the tiles are placed in position on the floor and properly cemented the entire floor of tiles is interlocked, so that any expansion or contraction will be taken by the entire floor, preventing the tiles from parting on the division lines."

And again:

"It will be understood that any form of lock may be used to unite the tiles, but I have shown a dovetailed lock as the preferred form."

The patent also says:

"By the use of the above-described tile, a floor can be laid or a wall or ceiling tiled which will yield sufficiently under tension or contraction without the joints between the tiles opening, as all the tiles are locked together. In some instances the tiles may be laid in combination with unyielding tiles, either of pottery or other material, so that while the yielding tiles will expand and contract with the strains, the joints between the tiles will not open; but I prefer to lay a floor entirely with yielding tiles."

The patent has but one claim, and that reads:

"I claim as my invention a tiled floor or wall composed of a series of tiles of yielding material, said tiles having interlocking tongues, and being removable, substantially as described."

As to the advantage of using tiles the patent says:

"The great advantage of using a tile of rubber in place of the ordinary strip rubber is that ornamental designs can be worked out upon the floor by the use of different colored tiles, and the floor can be repaired in the event of one or more of the tiles being destroyed or badly injured."

This, probably, is the reason the patentee confined himself to interlocking tiles of a yielding material, as such floors of strip rubber, interlocking, were old in the art, as shown by British patent to David Gaussen, No. 3,377, dated August 19, 1880, and in which it is expressly stated that the rubber mats may be joined by interlocking, and used on the decks of vessels. Tiled floors and tiled walls of stone and wood and other unyielding material were old long before this patent was applied for. Interlocking tiles of wood, stone, and other unyielding material were old long before Furness came into the field with this patent, and there is nothing new or novel in so interlocking them that one may be removed without materially disturbing the others when occasion demands. Interlocking by means of key blocks, as shown in figures 2 and 6 of the patent, were also old. So what is in fact a tiled floor made of tiles in fact, composed of india rubber or other elastic material, was old in the art as far back as 1860. October 16, 1860, letters patent No. 30,417, were granted to Thomas J. Mayall of Roxbury, Mass., manufacturer of tiles for flooring. In this patent he says:

"Be it known that I, Thomas J. Mayall, of Roxbury, in the county of Norfolk and State of Massachusetts, have invented certain new and improved manufacture of tiles or slabs for floors, etc. * * * The tiles heretofore in common use have been generally made of marble or other stone or slate, and their great cost has prevented their being generally employed for floorings, etc. The present invention consists in forming a cheap and durable substitute for

stone tiles, which is softer to tread upon, and prevents the liability of a person slipping thereon, and makes no noise when walked upon. I effect these results by making the tiles of a composition of india rubber or gutta-percha and sulphur, made into sheets, and then heated, and afterwards cut out in the desired size and shape by dies or knives, or moulded in proper moulds. I take 3 lbs. of sulphur and 12 lbs. of rubber or gutta-percha rags or trimmings, well known by rubber manufacturers, and mix them thoroughly together in the usual mode by grinding them between hot rollers. The composition is then formed into sheets of any desired thickness by being passed between calender rolls. * * * The tiles thus produced are possessed with peculiar elasticity or softness, which resembles that of rich carpet, whereby not only is a flooring produced that is very pleasant to walk upon, but is also noiseless and almost incapable of wear. As it is evident that any of the well-known compounds made by rubber manufacturers, into which other ingredients than those above stated enter, may answer the purposes of my invention, I shall not confine myself in my claim to the use of the substances I have mentioned, or to the exact proportions in which they are combined, although I prefer the composition described, as it can be made at a very small cost. * * * What I claim as my invention, and desire to secure by letters patent is the new manufacture of tiles and slabs for flooring, the same consisting of an india rubber or gutta-percha composition, which, when combined with various coloring ingredients, made into sheets of suitable thickness, cut or molded into desired patterns and vulcanized, produce tiles of the peculiar softness and nature herein described."

This patentee, Mayall, says nothing of interlocking the tiles of elastic material, or of the yielding of the entire tiled floor or wall when subjected to strain, tension, contraction, or expansion, or to the "weaving," heaving, or bending motion of the deck of a vessel at sea. He does speak of the elasticity, softness, and noiselessness. In short, he has provided tiles of "yielding material." In 1857 letters patent No. 16,692 were granted to Charles Mettam, of New York, N. Y., for a new and useful improvement in the mode of connecting the blocks or plates (nothing more nor less than tiles of iron) of iron pavements. The patent says:

"This invention consists in casting each block or plate with a number of hooks projecting laterally from its lower part, and turning upwards vertically in the form of tenons, and with a corresponding number of mortises in its lower side; the said hooks and mortises being so formed and arranged that when the blocks or plates are laid the laterally projecting portions of the hooks of each plate will give support to, and the upturned portions will enter the mortises in, the adjoining plates, and thus the plates will receive mutual support, and be locked together in a lateral direction. * * * I do not claim the casting of the blocks or plates with lateral projections on the lower parts to extend under the adjacent blocks or plates; neither do I claim the casting of the blocks or plates with tenons to enter mortises in the adjacent blocks or plates, when such tenons stand out laterally from the sides of the blocks or plates. But what I claim as my invention, and desire to secure by letters patent, is: Casting each block or plate with a number of hooks standing out laterally from below the general level of the bottom thereof, and turning upwards in the form of vertical tenons, and with a corresponding number of mortises in the lower faces, so that when the plates are laid together the vertical tenons of one block or plate enter mortises in adjacent ones, and the mortises receive tenons of adjacent ones, while the laterally projecting portions of the blocks or plates make them mutually supporting, substantially as herein described."

In this each plate or tile of iron is removable without disturbing the others materially, and all are locked together and receive mutual support in a lateral direction. The motion of pushing or pulling of the one is communicated to all. June 15, 1869, letters patent No. 91,364,

"improved mosaic covering for floors," were granted to Shadrach H. Pearce, of Boston, Mass. He says in his patent:

"Mosaic floors have heretofore been composed of sectional blocks or tiles of clay, stone, glass, or wood, of various sizes, forms, and colors, laid in hydraulic cement, or otherwise, to produce the pattern desired. A mosaic floor thus formed, especially when laid upon wooden foundations, is objectionable for the following reasons, viz.: It is inelastic, and does not yield to the expansion and contraction of the wooden foundation caused by atmospheric dryness or moisture. Considerable noise proceeds therefrom when walked upon, and the materials of which it is composed are cold to the feet, being poor conductors and retainers of heat, and much skill is required in their construction, which is attended with considerable expense. * * * To remedy the above-mentioned objections and defects, and to furnish a mosaic covering warm to the feet, and adapted to any, and especially to wooden, floors in lieu of carpeting, is the purpose of my invention, which consists in a series of elastic sections, blocks, or tiles of various sizes, forms, and colors, composed of india rubber, gutta-percha, felt, or compounds of these, or any other suitable elastic materials, each block or section bearing its respective color or colors throughout its entire substance, in contradistinction to one having its surface only colored, by which construction I am enabled, with or without the use of cement, to furnish a warm, noiseless, elastic mosaic covering for floors, etc., the design of which, formed by the various colors, is comparatively imperishable, and will remain permanently undefaced by use, and is easily repaired, by replacing with new any injured sections, its cost being less than that of an ordinary mosaic floor, while, from its elastic nature, it is easily adjusted to inequalities of surface which may exist or occur from the expansion, contraction, or warping of the groundwork upon which it is intended to be laid. To enable others skilled in the art to understand and use my invention, I will proceed to describe the manner in which I have carried it out. In the said drawings, A represents a wooden flooring or foundation, over which is smoothly spread a thin layer of cement, a, upon which, snugly fitted together, is placed a series of small hexagonal blocks or sections, B, composed of india rubber, gutta-percha, felt, or compounds of these or any other suitable elastic materials, each block bearing its respective color throughout its entire thickness or substance, so that when worn from constant use the original design will remain uneffaced upon the surface of the material covering the floor. I prefer to employ for this purpose a material known as 'kamtulicon,' which is composed of rubber and cork, ground and incorporated together, on account of its elasticity, durability, and moderate cost. The blocks or sections, B, are cut from strips of the elastic material employed, or they may be molded in the desired form; the color being incorporated with the material during the process of manufacture. * * * What I claim as my invention, and desire to secure by letters patent, is a covering for floors, &c., composed of a series of elastic blocks, sections, or tiles, substantially as described."

Here we have not only the tiles of yielding material, but the idea plainly expressed and stated of yielding sufficiently under the tension or contraction of the floor, as expressed in the Furness patent in suit; for Pearce says that the old floors, composed of sectional blocks or tiles, are objectionable for the reason they are inelastic, and do not yield to the expansion and contraction (swelling and heaving in places) of the wooden foundation (such as a ship's deck), caused by the atmospheric dryness or moisture, and that he seeks to remedy these defects. He also says that by the use of these elastic blocks or tiles he has a floor easily repaired "by replacing with new any injured sections," and also "while, from its elastic nature, it is easily adjusted to inequalities of surface, which may exist or occur from the expansion, contraction, or warping of the groundwork upon which it is intended to be laid." It would also, evidently, yield, being elastic, to any bend-

ing, warping, weaving, expansion, or contraction of the groundwork occurring after being laid; but of course there would be a crack or opening during such action in many cases. Should the floor swell and upheave, it would raise these elastic tile, and form a crack along the line of upheaval, and this would generally close, substantially, when the upheaval subsided. Looking further into the prior art, we find that February 24, 1880, there was granted to William J. Mitchell, of San Francisco, Cal., letters patent No. 224,938, for "paving tile." He says: "In the formation of my tiles I employ any suitable substance." It may be rubber, stone or brick; a yielding or a nonyielding material. There is no limitation. What is his purpose and claim? He says:

"My invention relates to certain improvements in tiles and blocks which are employed for paving purposes, and it consists in the formation of a block, so that its upper half will project beyond the lower half upon two adjacent sides, while the lower half projects beyond the upper half upon the two opposite and adjacent sides; said projecting portions being provided with dovetail depressions and interlocking projections, as hereinafter more fully described and claimed. By this construction the projecting upper half of each block will rest upon the corresponding projections of the lower halves of the two blocks lying next to it upon these two sides, and each block thus supports two others, and is, in turn, supported by two others. In combination with this construction, I form a dovetailed locking-groove upon the upper side of each of the projections of the lower halves, and similar dovetailed projections upon the under sides of the projecting ledges of the upper halves, so that they will fit into the corresponding grooves of the adjacent blocks or tiles, and thus lock them together, and prevent them from becoming separated. * * * It will be seen that when the tiles are laid each of the ledges, C, will support a corresponding ledge, B, from an adjacent block or tile, and the lugs, E, will be locked into the depression, D, so that the blocks will be mutually self-supporting, and will at the same time be bound together and prevented from separating. The tiles are thus easily and rapidly laid, and, being bound together, will not rock or become easily displaced when the foundation is imperfect. * *. * Having thus described my invention, what I claim as new and desire to secure by letters patent is: The paving tile or block, A, with its ledges, B, provided with the dovetailed projections or lugs, E, and the ledges, C, provided with the corresponding dovetailed depressions, D, whereby the tiles are supported and locked to prevent lateral separation, substantially as herein described."

Here we have the interlocking to bind the tile together, and prevent separation, rocking, and displacement. How far and wherein does this differ from the idea of the patent in suit? February 14, 1888, was granted to one Frank F. Gibford, of Englewood, Ill., letters patent No. 378,000, for "artificial stone pavement," and figure 2 of the drawings is almost an exact counterpart of figure 1 of the patent in suit, showing the interlocking of the tile. In the Gibford patent the tile shown are of stone and oblong. But this is immaterial so far as the mode of interlocking is concerned. Of his invention the patent says:

"My invention has relation to artificial stone pavements, and the object is to provide a simple, cheap, and durable pavement of the class described, that will present a true surface for wear, and at the same time obviate all tendency to cracks, separation at the joints, or irregularities in the surface; and to these ends the novelty consists in the construction of the same, as will be hereinafter more fully described and particularly pointed out in the claim. * * * The pavement proper consists of a series of blocks, A, provided with integral projections, a, and recesses, b, said projections and recesses being flush with the bottom of the block, and extending upward about one-half the thickness of the block. The top surface of the blocks is a true square, and consequently the pavement may be extended indefinitely by simply alternating the sides of

the blocks as they are laid—that is, so arranging them that a side with a projection will be contiguous to a side with a recess. It will be observed that the projections are rectangular in form, while the recesses flare inward, so that when the pavement is set in a bed or layer of cement the cement will fill up the interstices, and when it hardens or sets make it practically a solid sheet of pavement. * * * What I claim is, as a new article of manufacture, a block for pavements, having two of its sides provided with projections, and its two opposite sides provided with recesses, as set forth."

Here we have an artificial stone pavement formed of stone tile or a tiled floor in the street, and the tile are interlocked by means of "interlocking tongues," as are the tiles of the patent in suit, and the object of the interlocking is, as declared by the patentee, to "present a true surface for wear, and at the same time obviate all tendency to cracks, separation at the joints, or irregularities in the surface; and to these ends the novelty consists in the construction of the same, as will be hereinafter more fully described," and then follows a description of the interlocking, which is substantially a counterpart of the patent in suit. Substitute rubber tile, old in the art, and wherein does this structure of this patent differ substantially from the structure of the patent in suit? The interlocking is not precisely the same, but it is the same in principle, and operates in the same way to produce the same result, viz., to "obviate all tendency to cracks, separation at the joints, or irregularities in the surface." It seems to me immaterial that the Gibford device is to be used in a street to be walked and driven on, where from frost and other causes there is liable to be heavings and weavings, while the Furness patent in suit is mainly designed to be used on ships' decks or in similar places, where the heaving and weaving of the deck is caused by the motion of the sea. Substitute rubber tile in the Gibford patent, and we have, essentially, the Furness patent in suit. This Gibford patent would then operate as does the Furness patent. With stone tile in place of rubber tile, force applied to one causes a motion which is communicated to all, but not to the same extent, perhaps, and there is a greater liability to breakage of the tile. But this is due to the difference in the character and quality of the material. To obviate this liability to breakage, it would occur to any one to substitute rubber tile or tile of some yielding and resilient material in all places where such tile are appropriate, in all places not exposed to heavy traffic. Was it invention to do this? Was it invention to conceive the idea of substituting a rubber tile, old in the art, for a stone tile, old in the art, to prevent breakage, for the reason that rubber will not break as easily or readily as stone and is more resilient when subjected to strain? In the British patent to E. J. Harland, No. 4,806, March 19, 1889, for "improvements in the manufacture of elastic tiles," we have two claims, viz.:

"(1) Elastic tiles of vulcanized India rubber, each tile being of the same colour throughout its substance.

"(2) The process of manufacturing elastic tiles consisting in heating a mixture of india rubber or india rubber compound, pigment, and sulphur in a mould."

And this patent says:

"According to this invention, I manufacture elastic tiles of vulcanized india rubber, made of the same color throughout the substance of each tile. I pre-

fer to make the tiles by exposing a mixture of india rubber or india rubber compound, sulphur, and pigment to heat in a mould in the ordinary way of making vulcanized india rubber, but the mixture may also be vulcanized in sheets, and afterwards cut into any desired shape; but this is more costly, and involves waste for some shapes. The tiles may be fixed to the floor or other surface to be covered in various ways, but I prefer to employ a cement composed of two parts of gutta-percha, one part resin, and one part Stockholm tar. I find that tiles of vulcanized india rubber have many advantages over tiles and floor cloths as heretofore used. Being soft and elastic, they afford an excellent foothold, which is a matter of considerable importance in the decks and cabins of ships at sea, whilst their slightly yielding nature renders traffic over them noiseless, and enables such flooring to better withstand the wear and tear in entrance halls and landings, and, being impervious to water, they form a cleanly floor in smoking rooms and smoking carriages."

In the Watts patent, granted November 6, 1894, but applied for June 29, 1893, which is a design patent, we find a duplication of figure 3 of the Furness patent in suit, showing the interlocking of the tiles. As early as 1815, in the MacCarthy patent (British), No. 3,915, we have:

"Streets, roads, or ways may be paved or covered, or the paving, pitching, or covering of streets, roads, or ways may be made of or with a plate or plates, or mass or masses, a piece or pieces, a portion or portions, of iron or other metal or material, formed so as that the same shall present on the superficies thereof one or more or a series of convex rising or risings or projection or projections upwards, more or less elevated, and with spaces between and surrounding each rising or projection upwards, more or less broad, as occasion may require, or as may be suitable to the shape or limits of the street, road, or way paved or intended to be paved with the new pavement, such plate or plates, mass or masses, piece or pieces, portion or portions, when laid down adjoining or contiguous or fitted into each other, are or may be retained and kept so joined or contiguous or fitted into and with each other by means of a mortise or mortises, a socket or sockets, a tenon or tenons, projection or projections, tongue or tongues, as may be deemed expedient. The figures drawn in the margin of these presents will more particularly explain and illustrate the general description hereinbefore given and made. * * * A variety of other forms to be cast, manufactured, wrought, or made of iron, or other metal or materials, more or less convex and more or less elevated, with spaces more or less broad between, and insulating or surrounding such forms, may be cast, manufactured, wrought, or made, used, and applied for the purpose of paving, pitching, or covering streets, roads, or ways, and a variety of modes or methods of using and applying, connecting, fitting, and adapting the same, may be employed by means of mortises, sockets, tenons, projections, or tongues; but those hereinbefore described, and to which a reference or references hath or have been made, are sufficiently and certainly descriptive of the nature of my said invention, and in what manner the same is to be performed."

In the British patent to Geary, No. 8,085, dated 1839, "improvements in paving, covering streets, roads, and other ways," we have:

"Now know ye, that in compliance with the said proviso, I, the said Stephen Geary, do hereby declare that the nature of the said invented improvements, communicated to me by a certain foreigner residing abroad, consists in forming the pavements of streets, roads, courtyards, stableyards, and other public and private places and ways of blocks, composed either wholly of wood or other suitable material, or partly of wood and partly of the bituminous concrete hereinafter described, or other suitable material, or of blocks wholly of wood or of other suitable material superposed on blocks, consisting wholly of the said bituminous concrete or other suitable material, and which blocks, howsoever composed, are so shaped, formed, and connected that they shall mutually sustain and support one another; and I declare that the manner in which the said invented improvements are to be performed is particularly described and

ascertained in and by the following description thereof, reference being had to the illustrative drawings hereunto annexed, and to the indicial letters and figures marked thereon, that is to say: The said improved pavements may be of any of the forms represented in the drawings hereunto annexed, numbered from I to XVIII, inclusive. In Number I the blocks are superficially of a square form, but are dovetailed laterally into each other, while at the front and back they are connected by rabbit or by tenon and mortise joints to the blocks next adjoining, whereby every block and every row of blocks at once supports and is supported by those adjoining it, and a pavement of great solidity and uniformity is obtained."

In the British patent to Bayly, No. 4,878, granted November 8, 1881, we have:

"This invention consists of a contrivance to be bedded in mortar, each brick being fitted or locked one into the other, to render walls, chimney shafts, and other structures proof against gales of wind or other strains. The object of the invention is to erect walls, chimney shafts, and other structures made from clay in a mould or box of the different shapes or forms described on the draw-. ings, and burn in a kiln constructed for that purpose, in two respective forms locked together, one form or shape which is laid in one course constructed with a tenon, dovetail shape on the bottom, and a recess or mouth to receive the tenon constructed in the bricks in the next course on the top, these bricks being fitted one into the other, and bedded in mortar to receive the next course of the other shape or form, which are constructed with half a dovetail shape tenon at each end of the brick on the bottom, and half dovetail shape recess at each end of the brick on the top, this shape brick being made to slide into the bricks of the course beneath the other shape, properly bedded in mortar or cement; the different shape bricks being locked one into the other, laid in alternate courses to one another, which renders the whole structure proof against the greatest possible strain, each brick being locked one into the other, thus preventing any structure erected with these bricks giving away at the mortar joints. Bricks for angles and returns are constructed in the same way, locked one into the other. Having now described the nature of this invention and how it is to be performed, I therefore claim the following: First. I claim the shapes of the bricks, respectively, made from clay and burnt in a kiln. Second. I claim the contrivance of the bricks being locked one into the other and bedded in mortar. Third. I claim the locking of every brick one into the other to render any structure proof against every possible strain."

Here again we have the whole idea of the patent in suit except yielding material such as rubber, and the idea of placing the structure on a weaving curved deck or floor; but that is old, for in the David Gaussen British patent of 1880, No. 3,377, we find:

"My invention relates to the manufacture of sheets of what is known as vulcanized india rubber, or other india rubber compounds, and is designed for floor coverings, mats, coverings for seats, and various other purposes, and my said invention consists in corrugating, fluting, or arching the material on both sides, and also in uniting the corrugated sheets to produce cylinders or tubes. By my invention I am enabled to produce an article combining lightness and economy of material, with stability, resisting power, and elasticity, at same time securing thorough ventilation and dryness of surface, as the air can circulate freely through the material, and moisture will run off the same. * * * The material is adapted for various useful purposes, such as the following: Mats for wells at doors of houses and for ships at cabin doors. Do for footboards of carriages, railway carriages, especially smoking compartments, and for floors of boats, etc. Carpets for the floors of post office railway vans, relieving the clerks and letter sorters of much jar and vibration, which is now most injurious to them in long journeys, during which they are occupied in a standing position; also for smoking cabins, companion houses, stairs, deck-houses, etc., of steamers, for tents, bathrooms, billiard rooms (giving an elastic and luxurious tread), corridors of public offices, law courts, aisles of churches,

libraries, concert rooms, and all other places where absence of noise is desired, etc. * * * Where my corrugated material is to be used in stables as a substitute for straw litter, I cover so much of the flooring of the stall or box as may be required to form a bed for the animal, composed of several mats united together by interlocking or any other convenient method."

Here these corrugated mats of rubber are to be used for flooring or coverings for floors, and may be in pieces, large or small, and may be attached together by interlocking, as in the patent in suit. This interlocking is expressly mentioned in the Gaussen patent.

Returning, after this examination of the prior art, to the patent in suit, we find a claim for (1) "a tiled floor or wall" (old) ; (2) "composed of a series of tiles of yielding material" (old) ; (3) "said tiles having interlocking tongues" (old as to wood, stone, brick, and rubber sheets) ; (4) "and being removable" (old) ; (5) "substantially as described." I have not found in the prior art rubber tile, strictly speaking, interlocked; but I have found flooring and wall tile of other material, more or less yielding, interlocked, and also sheets of corrugated rubber, large or small, according to taste, used for coverings to floors, interlocked in any known way or manner, and the modes and manners of interlocking mentioned and described in the patent were then well known. The object and purpose of interlocking tile and their equivalents in floors, pavements, walls, and similar places was the same in the prior art as in the patent in suit, viz.:

"So that when the tiles are placed in position on the floor, and properly cemented, the entire floor of tiles is interlocked, so that any expansion or contraction will be taken by the entire floor, preventing the tiles from parting in the division lines."

As seen, this exact idea was old in the prior art. Nor is there anything new or novel in the idea of employing these tiles, or blocks, or sections of interlocking corrugated rubber flooring on the decks of vessels, or in other places where there is an upheaval or bending or weaving of the underlying support. It seems to me that, in view of the prior art, the patent in suit is devoid of patentable novelty, or of any new conception amounting to invention.

It is contended by the complainants:

"That close interlocking joints would hold elastic tiling together under such conditions was something which the prior art did not teach. It had not previously been proposed to interlock yielding materials subjected to varying and compound strains such as those to which a floor and the like is subjected."

And again:

"No prior art taught that the result of closely dovetailing rubber tiles together on all sides would be an elastic unit, so taking up, as a whole, the severest strains applied to it that the tiling would neither break nor pull apart. That rubber materials could be effectively dovetailed to accomplish any valuable result was a new thought with Furness."

The "conditions" referred to are thus described by complainants' counsel:

"He wished to provide a floor covering which would remain seamless and water-tight under extraordinary conditions of strain, due not only to exceptional expansion and contraction, but also to the constant changing of the shape of the deck."

While a patentee is entitled to the benefit of every new thing or beneficial and novel result resulting from his patented device, whether mentioned and described or not, we find that Furness makes no mention of a desire to patent a seamless and water-tight tile floor of yielding material. If so, he was clearly anticipated by the Gaussen patent, whose interlocking sections of corrugated rubber for covering floors are clearly the equivalents of rubber tiles.

I cannot agree with the contention that the prior art did not teach that close interlocking joints would hold elastic tiling together when subjected to strain, pulling and pushing at any given point, or along an entire side, or at any given point on or underneath the surface. If such interlocking would hold tiles of wood and stone and brick together under such conditions, they being slightly resilient and elastic, why would it not hold any yielding tiling, such as rubber, possessing a far greater elasticity or resiliency? That would be common knowledge, taught by common sense, and obvious to any person of ordinary intelligence, having any knowledge of the nature and characteristics of india rubber. It has been known since 1828 or 1832 that india rubber, or caoutchouc, will bend and stretch within limit without breaking, and regain its normal position when released from the applied force, because of its elastic and resilient properties. It required no prior art to teach a person of ordinary common sense and intelligence that tiles of rubber or like yielding material attached together, having resiliency or elasticity, would bend and stretch without breaking, unless the strain or tension were too great, and retained too long, and regain their normal position when the strain was removed. In 1820 one T. Hancock obtained a patent "for an improvement in the application of a certain material [rubber] to various articles of dress and other articles, that the same may be rendered elastic." In 1834 india rubber hose was patented on account of its elasticity, etc. More than 60 years ago we had vulcanized and hard rubber, and its durability and elasticity was quite well understood. It would have occurred to any one skilled in the art of floor-making or floor-covering that a series of tile made of hard rubber, or of any yielding material possessing elasticity and resiliency, would stretch and yield to upheaval and weaving, if not too severe, without breaking, and regain their normal condition, and thus prevent cracking, etc., especially when he had before him the prior art above referred to, wherein it was taught that "tiles thus produced are possessed with peculiar elasticity" (see Mayall and Pearce and Harland patents), and that these might be closely attached together, so as to form a unit (see Mettam, Mitchell, Gaussen, Geary, Gibford, and MacCarthy patents), and that a floor or floor-covering, when formed of "a series of elastic blocks, sections, or tiles," will "yield to the expansion and contraction of the wooden foundation [floor or deck] caused by atmospheric dryness or moisture," or by the swaying and weaving of a wall caused by wind (see Pearce and Bayly and Geary patents), and be mutually self-supporting (see Mitchell and Geary patents), and would "obviate all tendency to cracks, separation at the joints," and separation in or between the tiles (see Gibford and Harland patents). In short, the prior art plainly teaches everything suggested in the Fur-

ness patent in suit. If tile of stone, or brick, or wood, when interlocked by tongues or otherwise, form a unit, tile of yielding or elastic material will form when interlocked an elastic unit, which will bend and weave with the movement of the underlying foundation or floor or deck, and regain its normal position when the upheaval or weaving subsides or ceases, and, as in the Gibford patent of .1888, obviate all tendency to cracks. Every element of the patent is old, as is every idea of means and every idea of result to be accomplished. Mr. See, defendants' witness, testified as follows:

. "Interlocking dovetails, and the like, represent a well-known expedient in the art for holding things together, and they carry their capacity into any structure to which they may be applied. [Page 13, D. R.] Dovetails, and similar interlocking joints, were employed for the very purpose of preventing improper separation of the united parts, and it was for this precise purpose that they were applied to the edges of tiles, viz., to keep the tiles from pulling apart and opening the joints between them. [Page 21, D. R.] If hard tiles would crack and rubber tiles would not crack, it was simply because one was brittle and the other was tough, and the prior art taught more fully than anything found in the patent in suit all about the tough but elastic yielding nature of the rubber tile as against the hard tile. Again, if the joints between uninterlocked tiles will pull open and the joints between interlocked tiles will not pull open, it is simply because one is not locked against separation and the other is so locked, and the prior art teaches more fully than anything found in the patent in suit that the opening of the joints between the tiles may be prevented by providing their contiguous edges with interlocking tongues and recesses, such as dovetails." D. R. p. 25.

Speaking of this evidence, complainants' counsel says:

"The problem was not how to keep two things together side by side, but how to make a floor covering which would remain seamless under conditions of service never, thought of for any of the previous interlocking coverings."

The fallacy of this is demonstrated by a simple reference to the Gaussen patent, who not only interlocks his rubber sections, but states expressly that they are designed for use on the decks of vessels. For use there, they would be properly modified in construction and properly adapted to such a place, but the idea is flexibility, resilience, and unity, so as to conform to the shape and the weavings of the deck. The weaving of the deck of a ship is not a new discovery, a new condition to be met and provided for, but old, and, we may safely assume, was known to Gaussen and Harland. Whether Gaussen's corrugated, elastic, rubber sections, interlocked with each other, as he specifies they may be, to form an elastic unit, are to be used on the decks of ships, or the interlocking tile of the patent in suit, is a mere matter of selection, cost, and utility. The one will accommodate itself to the weavings and peculiar motion of the deck as well as the other. This is perfectly obvious. In either case the openings or joints between the sections or tile may be filled with a rubber cement if desired, or they may have an underlying carpet or support of rubber or other elastic and waterproof material. In the Harland patent of 1889 he speaks of the utility of his "elastic tiles of vulcanized india rubber when used in the decks and cabins of ships at sea." If interlocking tile of yielding material have gone quite largely into use in competition with noninterlocking tile, the fact is entitled to due weight. The commercial success of a

patented thing shows its utility, but does not establish its patentability. A thing may be new and of great utility, but not patentable. It must possess patentable novelty as well. Patentable invention must be disclosed. And here comes in the prior art. Many new and useful and novel contrivances go into use without the intervention of a patent. If the prior art discloses the claimed invention, and shows it to be old, it is immaterial that no one has used it. If all the elements are old, and the working or operation of the combination is old, and the result is old, how can one claim invention by putting it on the market, and building up a large trade in the article? Its utility and commercial value may not have been demonstrated, but to demonstrate these is not invention. Nor is it invention to merely substitute a tile of great resilience, elasticity, and durability in place of a stone or brick or iron tile, simply because it is more durable and useful. Complainants insist that what Furness did was "the attaining of a new result by giving to one of the elements of the structure, to wit, the dovetailed joint, a new character, function, and effect, making it essentially a new element." He says:

"There is no reference in this case for 'an elastic or yielding dovetail joint' having the office and function not only of joining parts of a structure and keeping them from separating, but that, of itself, responding to and communicating from unit to unit the effect of, strains, whether of tension or compression, so that a flooring or the like, composed of separate and removable tiles, will yet respond and accommodate itself as a unit to such strains, and the flooring will at the same time be practically as impervious as though consisting of a single sheet."

In all dovetailed joining of wood, or iron, or stone, the office and function is primarily to join the parts and prevent them from separating, and then, and because of such jointure, cause the parts so united as a unit to move or operate in unison, and respond to strains, upheavals, tension, or compression, or resist same, as one whole entire thing, and thus accommodate itself to all the wear and tear to which it may be subjected by reason of such strains. In this way force applied to one of the parts thus joined operates on all, and all are moved, more or less, together, or all resist, more or less, as one whole. Of course, different woods or metals may be dovetailed, as is frequently done, for the sake of appearance merely, but of such work we are not speaking.

I cannot discover that Furness has given to this dovetail joint any new function, or that in his patent it has assumed any new character, or that it operates to produce any new result or any old result in a different or better way. It is the same old joint, operating in the same old way, and producing the same old result. It is the century or more old idea of means applied to tiles of some yielding material, presumably more yielding than soft wood, which is itself a yielding material, and within and covered by the broad language of the claim. The elasticity and yielding character of the joint arises from the character and quality of the material thus joined and dovetailed together. It is yielding and elastic for the reason that the tile are yielding and elastic, and this was and is obvious.

In Du Bois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895, it was held that "the application of an old device to meet a novel exigency and to subserve a new purpose" was a useful improvement and patentable, and that the fact that defendant was able to produce the same result by another and different method did not affect plaintiff's right to an injunction." But here we have neither a novel exigency nor a new purpose. It is well settled that the end or purpose sought to be accomplished by a device is not the subject of a patent, but only the new and useful means for obtaining or accomplishing that end. Knapp v. Morss, 150 U. S. 221, 227, 14 Sup. Ct. 81, 37 L. Ed. 1059, and Wollensak v. Sargent, 151 U. S. 227, 14 Sup. Ct. 291, 38 L. Ed. 137.

In Loom Company v. Higgins, 105 U. S. 580, 26 L. Ed. 1177, it was held that a new combination of known devices, producing a new and useful result, as that of greatly increasing the effectiveness of a machine, is evidence of invention, and may be the subject of letters patent. This proposition is supported by a long line of unquestioned authorities. But this is far from a holding that to merely substitute interlocking tile of a yielding material for interlocking tile of a non-yielding material or of a slightly yielding material to form a yielding or bending floor—one that will yield to strains—is evidence of or discloses patentable invention, when it was perfectly obvious to any one that such substitution would produce such a result more perfectly, and the prior art taught that nonyielding tile or brick or stone thus interlocked would bend or yield to strain at the joints and obviate cracks or separation at the joints.

In Western Electric Company v. La Rue, 139 U. S. 601–606, 11 Sup. Ct. 670, 35 L. Ed. 294, it was held that:

"While the promotion of an old device—such, for instance, as a torsional spring—to a new sphere of action, in which it performs a new function, involves invention, the transfer or adaptation of the same device to a similar sphere of action, where it performs substantially the same function, does not involve invention."

Yielding tile or tile of yielding material were old in the art, and there was no invention in interlocking them. Series of them were used commonly, and had been for a long time, in the construction of tiled floors. All floors or foundations for floors were subject to strains, frost, moisture, heat, etc., and liable to swell or shrink, or to do both. Tile and paving stone had been interlocked, so as to remain integral and obviate cracks under such conditions, and while the patent says, "my invention relates particularly to the tiling of floors and decks of vessels, and especially to the decks of ocean steamships," this is a similar sphere of action, and in such a place the interlocked tile perform no new function. They bend and weave and move back and forth laterally, and up and down as before, and as a unit, being interlocked, in precisely the same manner as before, and the interlocking joints perform precisely the same function in the same way, viz., hold the tile together as a unit, and prevent, or tend to prevent, the formation of seams or cracks in the tiled floor.

It is settled law that not every improvement in an article is invention. The improvement must be the product of an original conception. Pearce v. Mulford, 102 U. S. 112, 118, 26 L. Ed. 93; Slawson v.

Grand Street Railroad, 107 U. S. 649, 27 L. Ed. 576; Munson v. N. Y. City, 124 U. S. 601, 8 Sup. Ct. 622, 31 L. Ed. 586.

In Smith v. Nichols, 21 Wall. (U. S.) 112, 118, 119, 22 L. Ed. 566, approved and quoted in Burt v. Evory, 133 U. S. 349, 358, 10 Sup. Ct. 394, 33 L. Ed. 647, it was held:

"But a mere carrying forward a new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents doing substantially the same thing in the same way, by substantially the same means, with better results, is not such invention as will sustain a patent."

What more do we have here? The original thought and conception disclosed in the prior art of floor-making and wall construction was to unite the several parts, or tiles, or paving blocks, or sections, by dovetailing or otherwise, and many methods, including the method in suit, are shown, so as to form a unit, and by such dovetailing prevent their drawing apart, separation at the joints, and the formation of cracks, etc., when subjected to strains, upheavals, etc., and allow the parts to retain and resume their original position when the strain was removed without breakage, and also to allow repair by removing one or more of the tile or sections when broken or worn, and replacing it without disturbing the rest of the floor; also to have the structure tight, so water would run off. The patentee, Furness, we will assume, has carried this idea forward, and given it a more extended application to ships' decks, in addition to the floors of buildings and the pavements of streets and the construction of walls, etc.; but he has not changed the form or the proportions of the floor, or the mode of the union of the tile or sections. He has substituted for stone, brick, iron, or cement tiles a yielding or elastic tile (and we will drop from immediate consideration the corrugated rubber sections of Gaussen, dovetailed together and used on the decks of ships); but these are equivalents, and he is doing substantially the same thing in substantially the same way, by substantially the same means, and, we will concede, with better results: He has a tile floor that responds to strains more quickly, readily, and safely. This is not invention. Burt v. Evory, 133 U. S. 349–359, 10 Sup. Ct. 394, 33 L. Ed. 647. The only new thought possible in the Furness patent is that rubber or yielding tile will bend and stretch more easily and more readily and safely than those made of wood, stone, brick, cement, or iron. To "think" that, when it was common knowledge, and only required the action of memory, was not the kind, degree, and quality of "thought" mentioned and referred to by the Supreme Court of the United States in Cash Reg. Co. v. Cash Indicator Co., 156 U. S., page 514, 15 Sup. Ct. 434, 39 L. Ed. 511. The thought there referred to is the conception or the origination of an idea, not the recalling to memory or the mere remembrance of a fact known or presumed to be known.

In Magowan v. New York Belting Co., 141 U. S. 332, 12 Sup. Ct. 71, 35 L. Ed. 781, the court said:

"None of these packings show anything which bears upon the Gately invention, except that they show piston-rod packings, but not having the construction or the characteristics found in the Gately invention. * * * In the

Gately packing the parts are kept together and in place solely by reason of the fact that the rubber has been subjected to vulcanization, thus making the packing a homogeneous whole, and not a strip rolled up upon itself, and thus kept together. Therefore, none of the patents introduced by the defendants show the Gately invention."

And then said:

"Within the requirements of Atlantic Works v. Brady, 107 U. S. 192, 200, 2 Sup. Ct. 225, 27 L. Ed. 438, we think that Gately made a substantial discovery or invention, which added to our knowledge, and made a step in advance in the useful arts; that within the case of Hollister v. Benedict Manufacturing Co., 113 U. S. 59, 73, 5 Sup. Ct. 717, 28 L. Ed. 901, what Gately did was not merely the work of a skilled mechanic, who applied only his common knowledge and experience, and perceived the reason of the failure of McBurney's packing, and supplied what was obviously wanting; and that the present case involves not simply 'the display of the expected skill of the calling,' involving 'only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and the facility of manipulation, which results from its habitual and intelligent practice,' but shows the creative work of the inventive faculty."

In Smith v. Goodyear Dental Vulcanite Co. et al., 93 U. S. 486, 23 L. Ed. 952, a case of the employment of one known material in place of another, it was held:

"Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683, decides that employing one known material in place of another is not invention, if the result be only greater cheapness and durability of the product. It does not decide that the use of one material in lieu of another in the formation of a manufacture can in no case amount to invention or be the subject of a patent. In the present case the result of the use in the manner described in the specification, of hard rubber in lieu of the materials previously used for a plate for holding artificial teeth, or such teeth and gums, is a superior product, having capabilities and performing functions which differ from any thing preceding it, and which cannot be ascribed to mere mechanical skill, but are to be justly regarded as the results of inventive effort, as making the manufacture of which they are attributes a novel thing in kind, and consequently patentable as such."

That covers this case on that subject, and demonstrates that the substitution of tile of a yielding material is not invention. The tiled floor of yielding material is not a novel thing in kind, nor does it have capabilities and perform functions which differ from anything that preceded it. The difference is in degree only.

In Topliff v. Topliff and another, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658, it was held:

"It is not sufficient, in order to constitute an anticipation of a patented invention, that the device relied upon might, by modification, be made to accomplish the function performed by that invention, if it were not designed by its maker nor adapted nor actually used for the performance of such function.

But this is not a case of actual and exact anticipation, but of want of invention in view of the prior art. No one, so far as appears, had dovetailed rubber tile together or tile of a like yielding material for use on a ship's deck or elsewhere. However, equivalent sections of rubber were thus united and used on ships' decks.

I am aware that a presumption of patentable invention goes with the patent, and that courts should and do go far to sustain them. In case of doubt it should be resolved in favor of the patentee, but when the court is not in doubt it should not hesitate to declare its convic-

tions I have carefully examined the evidence, including that of the experts, and am convinced that in view of the prior art the patent in suit fails to disclose invention.

There will be a decree dismissing the bill, with costs.