FALK MFG. CO. v. MISSOURI R. CO. et al.

(Circuit Court of Appeals, Eighth Circuit. July 2, 1900.)

No. 1,298.

1. PATENTS—INVENTION—IMPROVEMENTS IN RAIL JOINTS.

The Hoffman & Falk patent, No. 545,040, for an improvement in rail joints and methods of forming the same, is for a process, rather than a product, the essential steps of which as described and claimed consist in "cleaning or brightening the rail ends to be joined; forming or adjusting a mold upon said rail ends and over the joint, so as to surround the webs and base flanges thereof; heating said mold and rail ends, and pouring molten metal into said mold around and beneath the base flanges of both rails, and uniting said rail ends by fusion." *Held*, that such patent discloses nothing not previously well known in the art of cast-welding, and is void for want of patentable invention. It was also anticipated in the application of the process to the same and analogous purposes by numerous prior patents, the oldest of which were the English patent to Stephenson in 1831, the American patents of 1847 and 1849 to Martin and Fisher, and the English patent of 1851 to Norris; the latter covering a substantially identical method of joining the rails of railways.

2. SAME—APPLICATION OF OLD PROCESS TO NEW USE.

The fact that the modern invention of electric street railroads has rendered the process of greater utility as applied to the tracks of such roads, and brought it into general use, cannot give validity to the patent, since the process described and claimed is essentially old, and is applied without varying the operation to any appreciable extent.

3. SAME—UTILITY OF PATENTED PROCESS.

The great utility of a patented article, process, or improvement can only be considered, and allowed to turn the scale upon the question whether the inventive faculty has been exercised, when that question is balanced with doubt.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

For former opinion, see 91 Fed. 155.

Frederic H. Betts (Samuel R. Betts, on the brief), for appellant.

L. L. Bond and F. W. Lehmann (A. H. Adams, C. E. Pickard, and J. L. Jackson, on the brief), for appellees.

Before CALDWELL and THAYER, Circuit Judges, and ROGERS, District Judge.

THAYER, Circuit Judge. This action was brought by the Falk Manufacturing Company, the appellant, to restrain the infringement of United States letters patent No. 545,040, dated August 20, 1895, and issued to Albert Hoffman and Herman W. Falk under an application which was filed on March 18, 1895. The defenses principally relied upon by the defendants below, who are the appellees here, are want

of patentable novelty, and anticipation by the prior art. In the specification the patentees recite that they "have invented a certain new and useful improvement in rail joints and methods of forming the same"; that the "invention relates to new and useful improvements in rail joints and methods of forming the same"; and that the object of the invention "is to provide a suitable rail joint by means of which the rail ends may be securely united together so as to effectually prevent any vertical, lateral, or longitudinal movement of the rail ends after they have been joined, and at the same time to unite the body of metal which surrounds the rail ends securely to the surfaces of said rail ends by the fusion of the metal." Then follows a description of the method or process of forming the improved rail joint, which, according to the directions given in the specification, is substantially as follows: The ends of the two rails to be joined are first cleaned or brightened so as to remove any oxide or foreign matter which adheres thereto. A mold made in two sections or halves so as to embrace the webs and bottoms of the rail ends and form a chamber around the same for some distance on both sides of the point of junction is then clamped to the rails. Before being clamped to the rails, the mold is heated to a comparatively high degree, so as to communicate a part of its heat to the rail ends around which it is clamped. Through an aperture in the mold on one side thereof molten metal is poured into the chamber surrounding the webs and bottoms of the rail ends until it is filled. The molten metal is then allowed to set or harden, in the course of which process it fuses with the surface of the webs and bottoms of the rail ends, thereby uniting the rails firmly. The patentees suggest that when sufficient heat is not communicated to the rail ends by the heated mold, the required degree of heat may be obtained by continuing to pour the molten metal into the mold after the chamber surrounding the rail ends is filled, and allowing the molten metal to overflow through another aperture or hole in the opposite side of the mold until the requisite temperature is obtained. They further recommend the application of any suitable flux to the rail ends to obtain the desired fusion of the molten metal to the surface of the rail ends without the necessity of heating the same too highly and to that end they suggest that a thin sheet of fusible metal may be placed against the rail ends, which will melt when the chamber is filled with molten metal, and form a flux. They further direct the coating of the interior surface of the mold with a mixture of graphite and oil to prevent the molten metal from attaching itself to the mold. They further declare that "by our improved form of joint the rail ends are held together so as to be effectually prevented from springing or moving laterally or vertically, while by the fusion of the cast-metal body to the abutting rail ends said ends are held together, and all tendency of the rails to pull apart when contraction of the rails takes place will be effectually counteracted. Furthermore, by the fusion of the cast-metal body to the surfaces of the rail ends, the rails are electrically 'bonded,' thereby dispensing with the necessity of separately bonding the rails when our improvement is applied to the tracks of electric railways." They also say, in substance, that by the improvement in question the rails are held in unyielding

contact with each other, so that longitudinal movement of the rails is impossible, and the track is rendered smooth and even, and the liability of the rails to wear away at the joint in the track is effectually obviated.

The claims of the patent are five in number, and the first of these is as follows:

"We claim as new: * * * (1) An improved method of forming rail joints, consisting in cleaning the rail ends to be joined, forming or adjusting a mold upon said rail ends and over the joint, so as to surround the webs and base flanges thereof, heating said mold and rail ends, and pouring molten metal into said mold around and beneath the base flanges of both rails, and uniting said metal directly to the surface of said rail ends by fusion."

The remaining four claims of the patent are a substantial repetition of the first, the object of all the claims being to cover beyond peradventure, by means of some slight changes in the phraseology of the respective claims, the process of making a rail joint, which is above described. It is apparent, therefore, from an inspection of the specification and claims, that the patent in suit is for a special method of joining rail ends by casting metal around the abutting ends or joints. In other words, the patent covers a process, rather than a product, and the essential steps of that process, as described and claimed, consist—First, in cleaning or brightening the rail ends to be joined; second, in forming or adjusting a mold to the rail ends so as to embrace and form a chamber around the webs and base flanges of the same; third, in pouring molten metal into said chamber until it is full, and allowing the mold to remain in position until the molten metal sets or hardens. Three of the claims, namely, the first, third, and fifth, also mention the heating of said mold and rail ends as one of the steps in the process. The defendants insist that this method of making a joint or splicing the rails is not new; that the various steps of the process as detailed in the patent are each old in the foundrymen's art; and that the method of fusing cast iron to steel or wrought iron, thereby firmly uniting the two metals, which the patentees describe, had been described in earlier patents, and was well known to foundrymen. How far these claims are justified will be best disclosed by referring to several patents which are chiefly relied upon to show the state of the art and to sustain the defendants' contention.

In the year 1831 an English patent (No. 6,111) was granted to George Stephenson, the inventor of railroads, for an improved mode of making wheels for railway carriages. The process of making wheels which Stephenson describes in his patent is substantially as follows: The form of a wheel of the required size is first molded in sand in the usual manner. Hollow tubes of thin wrought iron to form the spokes of the wheel are then laid in the mold, radiating from the central cavity or hub, the ends thereof having first been treated with a solution of borax to serve as a flux. The outer ends of the spokes are made flaring or trumpet shaped. Melted cast iron is then poured into the central cavity of the mold to form the hub of the wheel and into the outer or circular cavity to form the felly, and the molten metal is allowed to set or harden. The felly is afterwards

surrounded with a strong wrought-iron tire, which is applied while hot, so that it may shrink while cooling. The patentee says, in substance, that when the molten iron is thus turned into the mold to form the hub and felly it flows around the ends of the thin wrought-iron spokes, and into the outer ends of the spokes for a short distance, and, in consequence of the previous application of borax to the ends of the spokes, the borax, acting as a flux, "causes the same to unite and adhere very firmly to the wrought iron," and hence makes a very strong wheel. In another part of his specification Stephenson says that the wrought-iron tubes forming the spokes are prepared for the molten cast iron which forms the hub and felly "by carefully cleaning the ends inside and outside from all dirt and loose scales, and then applying a thin glazing of borax to those ends." In another part of his specification he says that the melted cast iron will heat the thin wrought iron of which the spokes are formed to such a degree "as by the fluxing action of the borax will cause a very firm union to take place between the ends of the wrought-iron tubes which form the arms of the wheel and the cast-iron which forms the central nave and the circular rim thereof." After a careful examination of the specification of this patent it is obvious, we think, that Stephenson contemplated that a firm union by fusion would take place between the wrought iron and cast iron at the point where the several ends of the wrought-iron spokes came in contact with the molten cast iron which was intended to form the hub and felly of the wheel.

In the year 1851 an English patent (No. 13,500) was granted to R. S. Norris, which clearly foreshadowed the process now employed by the appellant for splicing steel rails, even if it is not the identical process. This patent, in the language of the inventor, "relates, firstly, to a method of joining together, fastening, or supporting the bars of railways, various parts of iron bridges, locks, and other erections, and consists in effecting such object by casting molten iron, or other suitable metal, upon or about the said rails or other parts intended to be joined, fastened, or supported." The drawings attached to the patent disclose a chill mold of metal made in two halves, and so constructed as to embrace and form a chamber around the webs and base flanges of the rail ends that are to be united. Through an orifice into this chamber molten iron is poured and allowed to set, thereby forming a chair upon the rails "fitting thereon [as the specification declares] exactly at every point." In one part of the specification the patentee says, "I pour molten iron or other suitable metal into the surrounding space [to wit, the chamber formed by the mold], and thus effect a perfect union of the two." He furthermore says, in substance, that in cases where it is deemed necessary to provide for expansion and contraction of the parts to which the molten metal is applied, he interposes a piece of canvas, coated with loam and lime, between the molten metal and those parts to be united with which it would otherwise come in contact. In view of this statement it is necessary to infer that, but for the interposition of the strip of canvas coated with loam and lime, the molten metal would form a chemical union with the parts to be united, and that in most cases where the process was employed such a union was in fact contemplated by the

patentee. Norris claims, among other things, as his invention, the "joining, fixing, or supporting the bars or other metallic portions of railways, bridges, locks, and other metallic erections by pouring molten iron or other suitable metal onto or about such parts."

As early as October 16, 1847, United States letters patent No. 5,331 were issued to William Martin, Jr., and Mark Fisher for what was claimed by them to be an "improvement in the manner of uniting or welding cast steel and steel of other kinds or wrought iron with cast iron." In their specification these inventors say, in substance, that attempts had been made to unite steel and wrought iron with cast iron by casting the latter while in a molten state upon the steel or wrought-iron surface with which it was to unite; that the process then in use was to brighten the face of the steel or wrought iron, and coat it with borax or some other analogous flux, and then lay it in the mold, and pour the molten metal thereon; that the result of such process had not been satisfactory, but, without changing the old process in any other respect, they proposed to overcome such difficulties as had been encountered by simply allowing the molten metal to flow laterally along the brightened steel or wrought-iron surface instead of falling thereon vertically. The alleged invention of Martin and Fisher appears to have consisted in a new method of pouring the molten metal into the mold, and it is noticeable that they claimed at that early date to be able to produce a perfect union between steel and wrought iron and molten cast iron by simply changing the direction in which the latter flowed into the mold. These same inventors —Martin and Fisher—took out another patent in the year 1849, being letters patent No. 6,054, in which they pointed out the advantages of heating the steel or wrought iron to which cast iron is to be welded or united before allowing the molten cast metal to flow laterally along the surface to which the cast iron is to be attached. For the purpose of raising the steel or wrought-iron plate to the requisite temperature, they filled a cavity in the sand mold with molten iron, placing the plate over the cavity, and when it was sufficiently heated allowed molten cast iron to flow across the upper surface of the plate that had first been brightened and coated with a flux.

In an English patent granted to Robert Richardson in the year 1854 a method of uniting the ends of gas and water pipe is fully described, which consisted in encircling the ends of the pipe to be joined with a mold and pouring molten cast iron into the chamber formed by the mold, thereby firmly uniting the two pieces of pipe. The patentee, while describing his process of forming a joint by means of molten metal poured around the ends of the pipe, says: "To effect or facilitate an effectual union of the melted metal with the iron of the pipes, the iron may have borax, tin, or zinc applied to it, or it may be cleaned with a file or an acid at those parts at which the union may be desired." In view of this statement it is evident that Richardson contemplated that the molten cast metal would become fused to the iron of the pipes if the latter was either treated with borax or other suitable flux, or if the pipes were thoroughly cleaned or brightened where they came in contact with the molten metal.

As further illustrating the state of the art prior to the alleged invention of Hoffman and Falk we only deem it necessary to refer specially to two other patents, namely, United States letters patent No. 27,227, issued to James Lippincott on February 21, 1860, and United States letters patent No. 160,816, issued to John Donovan on March 16, 1875. The first of these patents relates to the manufacture of axes, and describes a method of manufacture by which a piece of cast steel that is to form the cutting edge of the ax is placed at the bottom of a sand mold made in the shape of an ax, and a head is cast onto the same by filling the mold with molten "hot blast soft iron." The other patent relates to the manufacture of anvils, and describes a process whereby a steel plate that is to become the face of the anvil is placed in the bottom of a sand mold made in the shape of an anvil, and molten cast-iron is then poured into the same, which attaches itself firmly to the steel plate, and forms the mass or body of the anvil. These patentees showed that molten cast iron could be united to steel by fusion, and that the union of the two metals would be facilitated by first cleaning and heating the steel, and, like most of the other inventors, they recommended the use of borax "to assist the welding process."

Several other patents were offered in evidence by the defendants to show the state of the art and sustain their contention, but from the foregoing review of prior inventions and publications it is evident, we think, that when the patent in suit was issued it was well known to those who were skilled in the art to which the patent appertains that molten cast iron could be made to fuse or unite more or less perfectly with solid steel or wrought iron by bringing the molten and the solid metals in contact; that, in order to produce such a fusion or union, the surface of the solid metal where fusion was desired must be made clean or bright, so as to lay bare its "sensitive skin"; and that the union of the metals would be facilitated and rendered more perfect by heating the solid metal to a considerable degree, and applying thereto a suitable flux before the molten metal was allowed to come in contact with it. The prior art not only disclosed these facts, but it showed that railroad rails had been united by pouring molten iron around the webs and base flanges thereof by the use of a mold made in two sections more than 40 years before the patent in suit was issued. We are unable, therefore, to discover in what respect Hoffman and Falk, by their alleged invention, gave any additional information concerning the means by which molten cast iron could be made to fuse and unite with steel, or in what respect they made a distinct advance in the art of cast welding, to which their patent clearly relates. The process that they describe of uniting the ends of rails by pouring molten iron around the same cannot be differentiated from the process that had been described previously by Norris, unless it be assumed that Norris did not intend that the molten metal should become fused to the ends of the rails under any circumstances; and that assumption, as we have already remarked, is not warranted by the Norris specification, because he points out means by which such a fusion may be avoided when a union by fusion is not desired. The process described by Norris, like that described by Hoffman and

Falk, was designed to be performed in the open air, with the aid of a portable furnace, after the rails had been laid in place, and by the use of a mold made in two sections so as to form a chamber around the abutting ends of the rails. Moreover, we are not able to attach any importance to the fact that Norris did not suggest the cleaning of the rail ends as one of the steps in his process, since the cleaning process had been suggested by Stephenson. It was doubtless well known at that time to all foundrymen that, in order to effect that "perfect union" of molten cast iron with steel or wrought iron which Norris mentions, it was necessary that the steel or wrought iron should first be thoroughly cleaned of oxide or other foreign substances which adhered to it. But, even if we were willing to concede that the patent in suit describes a process of welding rail ends together by means of molten metal which is different from that suggested by Norris, in that the latter neither advised the cleaning nor the heating of the rail ends before the molten metal was poured into the mold, still the fact remains that long prior to the alleged invention by Hoffman and Falk other patentees had explained the necessity of cleaning and the utility of heating the surface where the union by fusion was to take place. It cannot be said, therefore, that they suggested a new step in the art of cast welding, or that by a change in the old methods of manipulation they succeeded in producing a result that was substantially new. The Lippincott patent of February 21, 1860, to which reference has already been made, fairly describes, as we think, every step in the process of fusing molten iron to steel which the patent in suit describes, including the use of a metal mold and the cleaning and heating of the steel which is to form the blade of an ax, before it is brought in contact with the molten iron which forms the head. But, if this were not the case, and if it did appear that the patentees had in fact blended various known steps in the art of cast welding that had not before been combined in a single process, we should nevertheless feel constrained to hold that in so doing they had displayed nothing more than ordinary mechanical skill; for if it be assumed that when Hoffman and Falk addressed themselves to the task of splicing rails their main object was to unite the molten metal firmly to the webs and base flanges by fusion, then it would be natural to expect that in accomplishing that object they would resort to all of those expedients disclosed by the prior art, such as cleaning and heating the rails, and applying a suitable flux, which experience had shown were useful in producing a firm union of the metals by fusion.

Counsel for the appellant have urged at some length and with apparent confidence that the process of splicing rails described by the patent in suit has proven to be of such great utility, especially in its application to the rails of street railroads operated by electricity, that it should be upheld even if it does appear, when viewed in the light of the prior art, that it suggests nothing new in the process of cast welding. They further urge that, although the patent describes an old method of welding, yet as it is applied in a new relation, or, in other words, to a use that is not analogous to any former use to which it has been applied, it should be upheld within the doctrine announced in Electric Co. v. La Rue, 139 U. S. 601, 11 Sup. Ct. 670, 35 L. Ed.

294; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275; Ansonia Brass & Copper Co. v. Electrical Supply Co., 144 U. S. 11, 18, 12 Sup. Ct. 601, 36 L. Ed. 327; and some other kindred cases. We are not able, however, to assent to either of these propositions. Without disparaging the utility of the process as applied to street railways, it may be said, we think, with entire accuracy, that it is better adapted to joining the rails of street railroads than to joining the rails which are used on steam railroads, because rails of the former kind are usually sunk deeply into the earth, and are held in position very firmly by the solid pavement of rock or cement in which they are embedded, which also protects the rail somewhat from the effects of heat and cold. Whether the process in question can be usefully applied to welding the rails of steam railroads has not, as it seems, been fully determined. But, be this as it may, since the method described and claimed is essentially old, a patent therefor ought not to be sustained merely because a new kind of rail is now in use on electric street railroads to which it can be successfully applied without varying the operation to any appreciable extent. The use of the process for the purpose of uniting the ends of two rails is analogous to the use made of it in the prior art for uniting the ends of two water pipes, the steel face and body of an anvil, and the steel blade and head of an ax. The use of the process for the latter purposes would, as we think, naturally suggest its use for uniting rail ends when it was deemed desirable to unite them. Moreover, the immediate result of the operation is in each instance the same, namely, the union of two metal bodies, one molten and one solid, by fusion at the point of contact. We discover no sufficient reasons, therefore, for holding that the use to which Hoffman and Falk applied the process in question was not analogous to the uses to which it had been applied in the prior art, and that the inventive faculty was exercised in suggesting the new use. Nor is the great utility of the process as applied to the construction of electrical street-railway tracks a sufficient reason for sustaining the validity of the patent. The utility of a machine, article of manufacture, process, or an improvement thereof, is only allowed to turn the scale in favor of its patentability in those instances where the question whether the inventive faculty has been exercised is balanced with doubt and uncertainty. Duer v. Lock Co., 149 U. S. 216, 13 Sup. Ct. 850, 37 L. Ed. 707; McClain v. Ortmayer, 141 U. S. 419, 429, 12 Sup. Ct. 76, 35 L. Ed. 800; Magowan v. Packing Co., 141 U. S. 332, 343, 12 Sup. Ct. 71, 35 L. Ed. 781; Smith v. Vulcanite Co., 93 U. S. 486, 495, 496, 23 L. Ed. 952. In such cases the conceded utility of a patented machine or process, or an improvement thereof, may well be allowed to sustain the patent; but conceded utility cannot be permitted to have that effect in a case like the one in hand, where the process which is described and claimed as new is clearly old. It results from what has been said that this court approves the action of the circuit court in dismissing the bill of complaint, and the decree below is therefore affirmed.