TUBELT CO. v. FRIEDMAN et al.

(Circuit Court, D. New York. January 8, 1908.)

No. 32.

1. PATENTS—INVENTION—SUBSTITUTION OF EQUIVALENTS IN OLD STRUCTURE.
Patentable invention is lacking in a structure all of the elements of which are found in the prior art, and where all the alleged inventor does to produce it is to take one of the prior patented devices and substitute for one of its elements a well-known equivalent taken from another device of the same kind where it was used for the same purpose, operated in the same way and produced the same results, and the only result of the substitution is that the operation of the structure is somewhat improved.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 24.]

2. SAME—LARGE USE AS EVIDENCE OF INVENTION.
A valid patent must combine utility, novelty, and invention, and neither large sales nor popularity nor effectiveness of itself shows patentable invention, nor do all together.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 39.]

3. SAME—WAIST BELT.
The Gaisman patent, No. 661,447, claim 6, for a waist belt made of a single piece of material doubled or folded longitudinally, and having the edges sewed together by means of a loop or zigzag stitch which will permit the material to be flattened out so that the edges will abut and lie in the same plane, leaving the surface smooth, is void for lack of patentable invention; the only difference between the structure shown and others in the prior art being in the character of the stitch used, which was also old and had long been used for similar purposes where an elastic seam was desired.

In Equity. Suit in equity to restrain alleged infringement of claim 6 of United States letters patent No. 661,447, dated November 6, 1900, to Henry J. Gaisman, for "Apparel Belt."

T. F. Bourne, for complainant.

Bartlett, Brownell & Mitchell (H. B. Brownell, of counsel), for defendant.

RAY, District Judge. Claim 6 of the patent in suit, the claim in suit here, reads as follows:

"6. As a new article of manufacture, a waist-belt comprising material folded upon itself so that its edges meet and stitches joining said edges together, said stitches being looped together between apertures from which they pass, whereby the edges of the material can aline or abut, the opposite walls or webs of said material being secured together, and a fastener attached to the belt, substantially as described."

The patentee in the specifications states the object of his invention in the following language:

"The object of my invention is to produce a lined strap or waist-belt in such manner as to simplify and cheapen the manufacture, while at the same time providing an improved structure. In carrying out my invention, I take a strip of material of more than the width of the belt intended, fold the same so that its longitudinal edges will lap, stitch said edges together in such manner that they can be made to abut or meet, and then arrange the abutting or meeting edges of the material along one face of the belt, and I then flatten the material and secure the opposed walls or webs together, whereby one wall or web forms the exterior or wearing side of the belt, while the other wall or web forms the lining. The belt has a buckle or other fastening device for holding it around the waist. The invention also consists in the novel details of improvement, that will be more fully hereinafter set forth and then pointed out in the claims."

He describes his mode or process of making his belt as follows:

"In forming the strap I take a piece of suitable material 3—say leather—of suitable length and of a width about double the width of the strap to be produced and fold the same upon itself longitudinally, so that its edges, 3a, 3b, will overlap (see Fig. 4), and I then stitch said edges together by such stitches as will allow the resulting tubular body to be flattened, so that the edges, 3a, 3b, will abut or meet (see Fig. 5)—that is to say, after said edges are stitched together the material of the tubular body thus formed is rolled or pushed laterally to move the stitched edges to one side of the position in which the stitching was done, so as to bring said stitched edges between the outer edges of the body thus formed (see Fig. 5). The character of stitch, 4, that I have shown and found adapted to the purpose is one in which the threads pass from the respective apertures in the form of loops that are interlocked at 4a about in line with the abutting edges of the material 3, which stitch I have shown is commonly known as 'overseaming' or 'zigzag.' Such a stitch, while joining the lapped edges of the material, as shown in Fig. 4, enables said material to be flattened out in two parallel walls or webs, 3c, 3d, while the edges, 3a, 3b, can abut or meet and lie in substantially the same plane. (See Fig. 5.) After the edges of the body are stitched together and moved to one side of the outer edges of the body the opposed walls or webs, 3c, 3d, are secured together, which may be done by glue or the like; but I preferably run lines of stitches 6 along through the material near the outer edges of the body and beyond the stitches 4, which bind the webs, 3c, 3d, so that they will not slip, thus producing a firm structure. By the means described I produce a lined strap or the like, because one of the webs can be used as the exposed surface and the other can be used as a finish or lining to the raw side of the first-mentioned web. It will be seen that by having the edges of the webs abut and by stitching them together, as described, they lie flat in line with the surface of the opposite web."

As to what he is enabled to do and does do, he says:

"By means of my improvements I am enabled to construct a strap, belt, or the like of double thickness, all made from a single piece of material, with finished edges, which are formed by the folded material, and the strap or belt is pliable and flexible and not liable to injury from folding or bending. It is evident that a strap or the like made in accordance with my invention can be used for various purposes, and while I have shown it arranged for a waist-belt I am not limited to such use."

Then in regard to his stitches and their character he says:

"I do not limit my invention to the precise formation of stitches shown, nor to the use of such stitches on the inner face of the belt, as it is evident that they could appear on the outer side of the belt to provide an embellishment thereto; nor do I limit my invention to the various details shown and described, as they may be varied without departing from the spirit thereof."

Therefore he may use any stitches which "will allow the resulting tubular body to be flattened so that the edges, 3a, 3b, will abut or

meet," etc. These edges are the edges of the belt-strap before being brought together by sewing. In short, he takes a strip of flexible material of suitable length for a belt, it may be one or more inches in width, and sews the edges together by any stitches that will will allow the resulting tubular body to be flattened with the edges of the belt piece brought· against each other, made to abut, and not with the one edge on top of or overlapping the other, thereby forming a ridge. He expressly says:

"The character of stitch, 4, that I have shown and found adapted to the purpose is one in which the threads pass from the respective apertures, 5, in the form of loops that are interlocked at 4a about in line with the abutting edges of the material, 3, which stitch I have shown is commonly known as 'overseaming' or 'zigzag.'"

Therefore there is no novelty in the stitch shown, and, further, he expressly says that any stitch that will permit the "material to be flattened out in two parallel walls or webs while the edges can abut or meet and lie in substantially the same plane" may be used. As the stitch is old and well known, we will inquire whether or not there is anything new or novel in thus sewing the strap or piece of material into a tubular body, so that, when flattened out, the edges will abut and not overlap and then flattening it out, whether lined or unlined with some other suitable material either sewn or pasted to the main piece of material called in the patent a "web or strap." We do not need to go much further, as the patentee expressly says that the buckle or fastener may be attached to the belt in any desired manner, and that he does not confine his claims to the connection thereof to the belt in the manner shown. The buckle and manner of fastening it to the belt are old.

Waist-belts and similar articles were not a new article ·of manufacture when this patent was applied for, October 26, 1899. The art was old and crowded. This waist-belt comprises (1) material folded upon itself so that its edges meet; and (2) stitches joining said edges together; and (3) said stitches being· looped together between apertures (holes in and near the edges of said strip or web of material) from which they pass, and whereby the edges of the material can aline or abut; and (4) the opposite walls or webs of said material (meaning the opposite walls or webs when pressed together, or when the belt is made of two strips and pressed together) being secured together; and (5) a fastener attached to the belt. The mode of attaching together the opposite or opposed walls or webs of the belt is thus stated:

"After the· edges of the body [folded material] are stitched together and moved to one side of the outer edges of the body, the opposed walls or webs, 3c, 3d, are secured together, which may be done by glue or the like; but I preferably run lines of stitches, 6, along through the material near the outer edges of the body and beyond the stitches 4 [the looped or other stitches attaching the two edges of the material in the first instance] which bind the webs, 3c, 3d, so that they will not slip, thus producing a firm structure."

In short, the two edges of the original strip or web of material having been sewed together, the edges abutting, so as to form a tubular body, the upper portion thereof is pressed down on the lower portion so as to form ·a double belt, or one having two thicknesses of material (opposed walls or webs), and we have in this new form two new

edges ("the outer edges of the body thus formed"), and, as this "body" has an upper layer or thickness of material and a lower one, and these are liable to move or slip, the one upon the other sidewise (not towards the end of the belt), and thus make a crooked unsightly belt, the upper layer ("wall or web") is gummed or glued to the lower or "opposed wall or web" or stitched thereto as mentioned. This sewing or glueing of the two parts was old in the art, as we shall see.

It is well perhaps to repeat what the patentee claims to have accomplished. He says:

"By means of my improvements I am enabled to construct a strap, belt, or the like, of double thickness, all made from a single piece of material, with finished edges, which are formed by the folded material, and the strap or belt is pliable or flexible and not liable to injury from folding or bending."

### He also says, to repeat:

"By the means described I produce a lined strap or the like, because one of the webs (folds) can be used as the exposed surface and the other can be used as a finish or lining to the raw side of the first-mentioned web. It will be seen that by having the edges of the webs (folds) abut and by stitching them together, as described, they lie flat in line with the surface of the opposite web."

Taking up these accomplishments in detail, we find that any one can, and, so far as this court knows or has heard or read, every one has for centuries, constructed straps, belts, and the like of double thickness from single pieces of material by simply folding the one half upon the other half. By sewing the two edges thus brought side by side "with the over and over stitch" or any other, leaving the thread loosely drawn, and then turning the doubled fabric till the sewn seam is uppermost, and then pulling the sewn ends of such fabric in opposite directions, we have the edges brought into position where they necessarily abut and do not overlap. Every housewife and seamstress has used and will use the stitch, leaving it loosely or tightly drawn as occasion demands, that will permit the necessary movement to bring the edges into the abutting position, and she will pass the thread through the material, as she always has, at a suitable distance from the edges to permit the adjustment; or, before sewing, she will place the edges of the material to be united in the abutting position, keep them there during the sewing operation, and sew "over and over" or use, "as the patent says," the commonly known "overseaming" or "zigzag" stitch and mode of sewing. When this is completed, press the upper fold on the lower, if pressing is required, and we necessarily and inevitably have, and always have had, the "finished edges" of the doubled fabric "which are formed by the folded material," and which are found at the point where the one fold turns upon the other. As to the pliability and flexibility of the strap or belt, this depends on the character and quality of the material used. Certainly it is not made more flexible or more pliable by being doubled or by the sewing operation. It remains in the same flexible or pliable condition it was before. It is neither more nor less liable to injury from folding or bending than it was before it was doubled and sewed. It is pliant and flexible, and not liable to injury from bending, etc., for the reason that such is the in-

158 F.—28

herent nature or quality of the material used. All this to which I have referred was old in the art as numerous patents and structures demonstrate. Now, as to the lining of the strap or belt, etc., when the material is doubled on itself, both the upper outside and the lower outside face outwardly and in opposite directions, while both inside surfaces are in contact and face inwardly. Of course, one inside surface looks up and the other down, or one east as the other looks west, but they are face to face. This is the necessary and well-known result, so far as I know or have ever heard, of folding a piece of material upon itself. I do not regard it a new or novel discovery that if a piece of leather, or other material, is folded upon itself, has the edges then sewed together, and it is then of suitable width to be used as a belt, and we desire to have one of the sides outwardly at all times, as the show-side, that the other side will act and serve as a lining therefor. This is naturally and necessarily so and obvious to all observers. It will be the side next the wearer of the belt. It is a part of the belt and its office or function is that of a lining while it is not something added to the belt in the usual sense of lining. This result of the folding is natural and old and inevitable. The sewing of two ends of any material so that they abut, instead of lying the one end upon the other, thereby forming a ridge, results in both lying in the same plane. The ends of each will be in the same plane as the main part, as neither is elevated on the other. This is perfectly natural and old. It is not a new discovery. Such structures made by sewing materials together using appropriate stitches to make a flat joint with the edges abutting was very old in the art, as we shall see. I can discover nothing new or novel in this structure or in the mode or process of making it. I do not think it above the skill of the ordinary housewife or seamstress reasonably skilled in making ordinary garments with fastenings therefor.

The complainant called Mr. Crane as an expert witness, who did not claim, as I discover, to point out any novelty, but he did tell how the stitches shown in all the exhibits in the case, some of which antedate the patent in suit, hold the edges of the doubled fabric in the abutting position, and thus form a flat or flush surface. He says:

"Such abutting of the edges is necessary to form a flat or flush surface at the line of the seam, and it will be noticed in all of the exhibits that the edges of the leather are firmly held in such flattened and abutting position by the loops of the stitches, which are engaged between the apertures from which they pass, and directly across the abutting edges, so that the latter cannot roll or curl upward, but are held permanently in line. The edges of a thick material like leather remain abutted when rolled within the stitches, which is rendered possible by the mode of stitching employed, which embraces the edges of the belt during the stitching operation and does not connect the opposite walls together; but leaves them free so that the edges can roll within the loops of the stitches as already described."

That such is the result of the "over and over sewing"—the most primitive stitch in the art—as well as of that old and well known, and, as the patent itself says, "commonly known as 'overseaming' or 'zigzag'" stitch, is and was well known to any observer. It was shown in the prior art. These zigzag stitches are the stitches shown, and they are, I think, the loop stitch referred to in claim 6. But, if not,

the prior art shows it plainly and beyond all question. R. S. Allyn, defendant's expert, said:

"To recapitulate, I find in the prior art referred to the full equivalent of the construction of claim 6 of the patent in suit. In my opinion the type of stitch employed is unimportant. The prior art shows the identical overseam or zigzag stitch of the Gaisman patent in suit to be old in the Blanchard patent, No. 167,492, and for the identical purpose of the Gaisman patent, namely, producing a flat seam. (See Fig. 1 of the Blanchard patent.) This type of stitch is also shown and for the same purpose in the Blanchard Patent, No. 174,764, dated March 14, 1876, in Figs. 7 and 8. In this case, it is true, that the seam is covered with suitable material, C, for protection. The flat seam referred to in this connection is the seam between the two strips, D–D, in Fig. 7, and shown at the edges, B–B, in Fig. 8 of the Blanchard patent. I also find a flat seam formed by the same type of stitch in the Henriksen patent, No. 215,615, dated May 20, 1879. See Figs. 15 and 16, showing the two sides of the material at the seam. The Bullock patent, No. 268,618, dated December 5, 1882, shows another type of stitch, E., for forming a flat seam along the edges, D, of the material. The Brownson patent, No. 312,081, dated February 10, 1885, shows the ordinary hand stitch in Figs. 3 and 4, for producing a flat seam. The Broadnax patent, No. 340,280, dated April 20, 1886, before referred to, shows the over and underhand stitch, h, Fig. 1, for producing a flat seam. These prior art patents show some of the various methods of producing flat seams by different stitches determined by individual preference. In the Ames patent, No. 454,404, dated June 16, 1891, the zigzag elastic stitch of the Blanchard patent, No. 167,492, is referred to for uniting the edges of breadths of carpet so as to produce an even surface at the seams when laid."

Mr. Allyn gives an analysis of claim 6 of the patent in suit, and says of it:

"In this claim we find that a new limitation not set forth in any of the previous claims is introduced. It is: 'Said stitches being looped together between apertures from which they pass, whereby the edges of the material can aline or abut.'"

He then says:

"In each and every one of defendant's exhibits, 'Peak City Guards Belt, Wright Knapsack Harness, National Guard Belt No. 3, Crittenden Belt, Judson Military Belt and Oothout-Acker Belt,' I find all the elements of construction set forth in claim 6, except the particular type of stitch."

Also he says:

"The stitch employed is commonly known as 'overseaming' or 'zigzag.' In this type of stitch the thread is interlocked or looped together as at 4a, Fig. 5, of the patent in suit, between the apertures, 5–5, from which it passes."

All this is true, as an examination of the exhibits demonstrates. The question resolves itself into this: On this branch of the case, is patentable invention disclosed in the conception or idea of using this old loop stitch in place of the over and over stitch shown in National Guard belt No. 3 and Crittenden belt, especially when both serve the same purpose, perform the same function, produce the same result? Both were known. Was it not a mere matter of choice, of selection? Suppose that, with a dozen or more well-known stitches before him, a person, after experiment, finds that one, which others have not used in a certain place for a certain purpose, will do the work better than those in use, but it was well known that they would perform the same function, and produce the same result, is he an in-

ventor? Can he have a valid patent on such a discovery and monopolize the use of that stitch for that purpose in that particular art, when all were at perfect liberty to use it before, but did not so far as shown in the exercise of their right of selection? I think not.

The patentee, Gaisman, in claim 6 has reproduced the belts of the prior art, substituting for the over and over stitch this old loop stitch, a well-known equivalent, except that the loop stitch, it is alleged, makes the flat seam a little firmer and flatter, and keeps the edges in better alinement, so that as the belt bends the edges are less liable to show. The affect of the stitches is one of degree only. The one, at best, is superior to the other only in that it is a little more effective. Such a substitution is not patentable invention. Smith v. Nichols, 21 Wall. 112, 118, 119, 22 L. Ed. 566, quoted and approved in Burt v. Evory, 133 U. S. 349, 358, 10 Sup. Ct. 394, 33 L. Ed. 647; Sloan Filter Company v. Portland Gold Mining Co., 139 Fed. 23, 71 C. C. A. 460; Crouch v. Roemer, 103 U. S. 797, 26 L. Ed. 426.

In Smith v. Nichols, supra, the Supreme Court expressly decided:

"A mere carrying forward, a new or more extended application of the original thought, a change only in form, proportions or degree, the substitution of equivalents doing substantially the same thing in the same way, by substantially the same means, with better results, is not such invention as will sustain a patent."

Here all we have is the substitution of an equivalent, the old and well-known loop or zigzag stitch, for the over and over stitch of many patents in this art, with better results, it is claimed, only. This says the Supreme Court of the United States is not invention. Merely transferring an old element to a new sphere of action, when it performs its old function in the same old way to produce the same old result, is not invention; but, if it be so transferred to meet a novel exigency and serve a new purpose, it may be. Du Bois v. Kirk, 158 U. S. 58, 15 Sup. Ct. 729, 39 L. Ed. 895. In Western Electric Company v. La Rue, 139 U. S. 601, 606, 11 Sup. Ct. 670, 672, 35 L. Ed. 294, the court held:

"While the promotion of an old device, such, for instance, as a tonsorial spring, to a new sphere of action, in which it performs a new function, involves invention, the transfer or adaptation of the same device to a similar sphere of action where it performs substantially the same function does not involve invention."

In the case now before this court the patentee has made a belt, old in the art, by the use of the same processes and modes of construction and materials as were used in and well known to and described in the prior art; but he has substituted for the old and well-known over and over stitch, one of the things to be used in one of the several steps to be taken, the old and well-known loop or zigzag stitch, the one being the well-known equivalent of the other, doing the same work in the same way and accomplishing the same precise result, except that this result by such sewings in this belt is somewhat the better for the substitution. This sewing is an independent process in the construction of the belt, and is no wise affected or modified by, nor does it in any wise affect or modify, the other steps in the construction or manufacture of the belt or other similar article. This

substitution does not constitute or involve invention. Here we have no new or novel exigency. Here we have no new purpose to be served. The object of the sewing, the purpose to be served, is precisely the same as in the prior art, viz., "such stitches as will allow the resulting tubular body to be flattened, so that the edges, 3a, 3b, will abut or meet," and "such a stitch while joining the lapped edges of the material, as shown in Fig. 4, enables said material to be flattened out in two parallel walls or webs, 3c, 3d, while the edges, 3a, 3b, can abut or meet and lie in substantially the same plane." This is what the patent in suit says.

In August, 1873, Helen A. Blanchard obtained patent No. 141,-987, for a sewing machine that would stitch or sew with this overstitch. In September, 1875, she obtained patent No. 167,492, for "improvement in methods of uniting knit goods," etc. She speaks of prior methods, and says:

"The objections, however, to this method of joining knit goods are many. The operation is made dependent on selvage loops, and the stitches, if they may be called stitches, are governed by the number of loops."

Selvage loops are not made by the thread used in sewing or by the sewing operation. They are made a part of or attached to the fabric to be sewed. She shows her stitches in figs. 1 and 2 of the drawings, and it is obvious that they are the stitches of the patent in suit, and the witness Allyn also testifies to this fact, and then says:

"I purpose using what may be called the 'diamond overstitching seam,' which I apply in a manner altogether novel—that is to say, by sewing with a vertically-reciprocating needle directly through the two thicknesses of goods along their edges, placed upon a flat horizontal cloth-plate, and fed along under the needle progressively with formation of the stitches (which in no sense are dependent upon selvage loops), said needle passing alternately directly through the goods and outside the same, so as to form the diamond overstitch-seam, uniting the edges in a fine compact seam, which, at the same time, possess all needed flexibility and elasticity. * * * Fig. 1 shows the elastic stitch, a, as used in uniting the edges of knit goods and hosiery, and set by a double-thread machine. Fig. 2 shows the stitch as set by a single-thread machine for the same purpose. * * * Any sewing machine, with a few slight modifications which do not interfere with its ordinary work, can be used to carry my invention into effect. Any overseaming-machine capable of sewing a zigzag or irregular stitch may be used in uniting the edges by an alternate stitch inside and outside the goods, as aforesaid. One machine adapted for the purpose of my present invention, will be found in my letters patent No. 141,987, August 19, 1873."

Allyn says:

"As before mentioned, the stitch referred to by Ames is the same stitch as that selected by Gaisman for illustration in the patent in suit."

This establishes the fact that there was no novelty in the stitch used and adopted by the patentee of the patent in suit. In another patent to Helen A. Blanchard granted March 14, 1876, No. 174,764, "improvement in welted and covered seams," she shows the same stitch in Figs. 7 and 8. Her main purpose she says is to "Furnish protection to the parts of the threads exposed on the wearing surface. This I do in two ways, viz.: By the insertion of a piping or welt;

by sewing a strip over the seam." When she uses this stitch and protects the seam by a strip over it, she does not use the piping. She also says:

"My invention relates to seams of cloth, leather, or any other suitable material made by placing the two edges to be united, the one over the other, as shown in Fig. 8 of the accompanying drawings, and then alternately stitching within and without the edge; afterward flattening out the seam so that the edges will abut," etc.

Also:

"The sewing is then done by a machine adapted to sew zigzag, or over the edge, as for instance, is shown in my letters patent No. 161,471," etc.

And again:

"I do not claim the simple insertion of a piping or welt in a seam, nor the covering of a seam with a strip of suitable material sewed over the same; but in a seam made by alternately stitching within and without the edge of the material sewed, and then flattening the materials out so that the edges shall abut, as a protection," etc.

Here we have the prior art, as far back as 1876, plainly teaching this style of sewing, this stitch, as well as the idea of sewing two edges together so the parts may be flattened out and the edges made to abut. The patentee of the patent in suit, Gaisman, had every idea contained in the patent in suit plainly taught him by the prior art, with which he is presumed to have been familiar. All he had to do was to make a belt by this sewing and this flattening process taught him by a woman. Of course, to attach a buckle or other fastener at one end was simple enough. In the Ames patent of June 16, 1891, No. 454,404, "apparatus for sewing carpets," he says, referring to one of the Blanchard patents:

"I prefer, however, a machine which will make a well-known zigzag elastic stitch, substantially like that shown in letters patent, No. 167,492, of September 7, 1875, for the carpet will then present an even surface at the seams when laid."

If anything further is necessary, we may turn to the Morrow patent, No. 413,531, dated October 22, 1889, "method of overseaming fabrics." Here the fabric is placed together, one piece on the other. Then two of the edges at one side are crocheted together. Then the two parts are separated at the free ends and flattened out; and the crocheted edges abut. This looping stitch and flattening out of the material and abutting of edges was also shown and particularly described in the patent to Hans P. Henriksen, No. 215,615, of May 21, 1879, in the following words, viz.:

"The stitch, the construction and appearance of which will be understood by reference to Figs. 15 and 16 is formed in the following manner: The needle, perforating the material horizontally and at a right angle thereto, carrying the thread with it, crosses from disk v to disk w, where it is received upon and guided by the spring-cushion, 7. At the point where it has reached the end of its forward throw or motion, it is met by the descending oscillating shuttle, which catches in between the needle and upper thread, carrying its thread, d'', under the needle-thread, e', while the latter is slack and commencing its double return motion—that is, reversing its oscillation within carrier M simultaneous with the retrograde movement of the said carrier itself, within which it is inclosed—at the time the take-up hook, S',

is at its highest point, and the needle-thread consequently tightened. At the end of the stroke of the needle on disk v this operation is repeated, so that two loops or locks are formed at each stitch, one on each side of the seam, by which a zigzag or cross stitch, formed by the thread d' crossing from one side to the other, is formed upon one side of the material or fabric, as shown at Fig. 15, and a series of crosswise parallel double-thread stitches on the opposite side, as shown in Fig. 16. The seam thus formed is not only very ornamental (especially if thread of different colors be used), but exceedingly strong, and yet very elastic, so that it may readily be flattened out by simply pulling the two pieces of fabric in opposite directions until their edges shall be perfectly flat and flush with each other, merely impinging upon, but not overlapping, each other, as seen in Figs. 15 and 16 of the drawings."

It will not do to find patentable invention in a device or structure where all its elements are found in the prior art, and all the alleged inventor does to produce it is to take one of the prior patented devices, and leave out one of its elements and substitute in place thereof a well-known equivalent taken from another device of the same kind, where it was used for the same purpose, operated in the same way, and produced the same results as is required in its new location, and the sole result of the substitution is that the substituted element operates or works a little better than did the displaced one, and thereby the operation of the alleged new structure is somewhat improved. This is improvement, but not invention. It may be a successful experiment, but there is no novelty. "While a combination of old elements producing a new and useful result may be patentable, if the combination is merely the assembling of old elements producing no new and useful result invention is not shown." Computing Scale Co. of A. v. Automatic Scale Co., 204 U. S. 609, 27 Sup. Ct. 307, 51 L. Ed. 645. To constitute improvements in invention they must be the product of original conceptions. Pearce v. Mulford, 102 U. S. 112, 118, 26 L. Ed. 93; Slawson v. Grand Street Railway, 107 U. S. 649, 2 Sup. Ct. 663, 27 L. Ed. 576; Munson v. N. Y. City, 124 U. S. 606, 8 Sup. Ct. 622, 31 L. Ed. 586.

Here complainant contends that its belt as a whole, a completed thing, is made better, more durable, more attractive, more salable by reason of the substitution; but conceding all this to be true patentable novelty is not shown. The better result does not show invention. Smith v. Nichols and Western Electric Co. v. La Rue, supra. Its greater utility, durability, attractiveness, and marketability do not of themselves show patentable novelty. These facts are evidence on the subject, and in very doubtful cases may be persuasive and turn the scale in favor of the patentability of the device. A valid patent must combine utility, novelty, and invention. Neither large sales nor popularity nor effectiveness of itself shows patentable invention. Nor do all these combined establish it. See Duer v. Corbin Co., 149 U. S. 216, 223, 13 Sup. Ct. 850, 37 L. Ed. 707; Richards v. Elevator Co., 159 U. S. 477, 487, 16 Sup. Ct. 53, 40 L. Ed. 225; American Sales Book Co. v. Bullivant, 117 Fed. 255, 54 C. C. A. 287; McClain v. Ortmayer, 141 U. S. 419, 429, 12 Sup. Ct. 76, 35 L. Ed. 800; Union Biscuit Co. v. Peters, 125 Fed. 601, 609, 60 C. C. A. 337; Falk Mfg. Co. v. Missouri R. Co., 103 Fed. 295, 43 C. C. A. 240; New Departure Bell Co. v. Bevin Bros. Mfg. Co., 73 Fed. 469, 19 C. C. A. 534; Dodge Coal Storage Co. v. N. Y. C. & H. R. R. Co., 150 Fed. 738, 80 C. C.

A. 404. In New Departure Bell Co. v. Bevin Bros. Mfg. Co., supra, Judge Lacombe said:

"But this precise mechanism was described and published to the world in the Bennett patent, and is used in complainant's bell with no other reorganization of operative parts than the insertion of an additional gear and pinion wheel, and such a shifting of the spring as introduces no new function. In our opinion such unsubstantial changes do not involve invention."

In Dodge Coal Storage Co. v. N. Y. C. & H. R. R. Co., supra, Judge Townsend said:

"The would-be inventor or designer of novel mechanism for accomplishing these objects, therefore, is presumed to have before him the whole field of the art of the engineering construction applicable to the collection and removal, the elevation, and conveyance of such materials from one point to another. And the question here presented is, not what these particular patentees may actually have invented, but whether the state of the art in such engineering field was such that it would require invention to construct such apparatus, or to adapt the constructions known in the art to the exigencies of a particular situation, or the requirements of a certain class of materials. * * * We conclude, therefore, that the patentees did not devise any novel means by which to carry out their ideas and put them in shape for practical operation."

In McClain v. Ortmayer, supra, the court said:

"This court has held in a number of cases * * * that in a doubtful case the fact that a patented article had gone into general use is evidence of its utility. It is not conclusive even of that—much less of its patentable novelty."

Scores of pertinent quotations might be made, but it is not necessary. The complainant's belt is exceedingly attractive and neat. Evidently, so far as the evidence discloses, it is of great utility and the best on the market, but these facts do not prove patentable invention.

In view of the prior art and prior well-known uses, the complainant's patent fails to show patentable invention and is void.

There will be a decree for the defendant dismissing the bill, with costs.